MATTHEW D. POWERS (Bar No. 104795)
matthew.powers@weil.com
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA  94065
Telephone: (650) 802-3000
Facsimile: (650) 802-3100

ELIZABETH STOTLAND WEISWASSER
(New York Bar No. EW-0736 – *Pro Hac Vice*)
elizabeth.weiswasser@weil.com
JENNIFER H. WU
(New York Bar No. JW-1201 – *Pro Hac Vice*)
jennifer.wu@weil.com
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY  10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Defendant
MEDICIS PHARMACEUTICAL CORP.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IMPAX LABORATORIES, INC., | Case No. C08-00253 MMC |
| Plaintiff, | **DECLARATION OF JENNIFER H. WU IN SUPPORT OF MEDICIS' MOTION TO DISMISS** |
| v. | |
| MEDICIS PHARMACEUTICAL CORP., | Date: April 11, 2008<br>Time: 9:00 a.m.<br>Ctrm: #7, 19th Floor |
| Defendant. | |
| | The Honorable Maxine M. Chesney |

1           I, Jennifer H. Wu, under penalty of perjury, declare as follows:

2              1.     I am an associate in the law firm of Weil, Gotshal & Manages LLP, counsel

3  for Defendant Medicis Pharmaceutical Corp. ("Medicis") in this matter.  I am a member of the bar

4  of the State of New York and am admitted *pro hac vice* in this action.

5              2.     I submit this declaration in support of Medicis' Motion to Dismiss.

6              3.     Attached hereto as Exhibit 1 is a true and accurate copy of the December

7  20, 2007, Letter from Roger Chin to Jonah Shacknai.

8              4.     Attached hereto as Exhibit 2 is a true and accurate copy of the January 11,

9  2008, Letter from Seth Rodner to Roger Chin.

10             5.     Attached hereto as Exhibit 3 is a true and accurate copy of <u>Bridgelux, Inc.</u>

11  <u>v. Cree, Inc.</u>, No. C 06-6495 PJH, 2007 WL 2022024 (N.D. Cal. July 9, 2007).

12             6.     Attached hereto as Exhibit 4 is a true and accurate copy of <u>Prasco v.</u>

13  <u>Medicis</u>, No. 1:06cv313, 2007 WL 1974951 (S.D. Ohio July 3, 2007).

14

15           I declare under penalty of perjury that the foregoing is true and correct.

16

17  Executed: March 5, 2008

18                                 Jennifer H. Wu

19

20

21

22

23

24

25

26

27

28

# Exhibit 1

RECEIVED

DEC 2 1 2008

 Wilson Sonsini Goodrich & Rosati
PROFESSIONAL CORPORATION

One Market Street
Spear Tower, Suite 3300
San Francisco, CA 94105-1126
PHONE 415.947.2000
FAX 415.947.2099
www.wsgr.com

December 20, 2007

Jonah Shacknai
Chief Executive Officer
Medicis Pharmaceutical Corporation
8125 North Hayden Road
Scottsdale, Arizona 85258

**Re:    Minocycline HCl Extended Release Tablets**

Dear Mr. Shacknai:

I write on behalf of IMPAX Laboratories, Inc. to inform Medicis Pharmaceutical Corp. that IMPAX has submitted an ANDA under section 505(j) of the Federal Food, Drug, and Cosmetic Act, in order to obtain approval to commercially manufacture and sell minocycline HCl extended release tablets.

The drugs for which IMPAX seeks approval have the same active ingredient, route of administration, dosage form, and strength as those of 45 mg, 90 mg, and 135 mg SOLODYN™ extended release tablets. Additionally, they are bioequivalent to SOLODYN™ extended release tablets, and they will have labeling that is the same as the labeling approved for SOLODYN™ extended release tablets, except for changes required because they will be produced and distributed by a different manufacturer.

We have noted that U.S. Patent No. 5,908,838 is listed on the Prescribing Information for SOLODYN™ extended release tablets. Furthermore, Medicis has asserted in its recent SEC Form 10-Q that a generic competitor to SOLODYN™ faces "the risk of a suit for patent infringement." These statements suggest that Medicis intends to enforce the '838 patent against products that are used in the same manner as SOLODYN™, and that Medicis further seeks to stifle competition in the market for minocycline HCl extended release tablets. These efforts are clearly improper, since the claims of the '838 patent issued only because the patent examiner was not aware of highly relevant prior art during prosecution of the '838 patent.

If Medicis were to attempt to enforce the '838 patent against IMPAX, we believe such an effort would be objectively and subjectively baseless, and would give rise to potential antitrust liability. Indeed, even marking the '838 patent on the Prescribing Information for SOLODYN™ may be actionable without a good faith basis for concluding that the claims of the '838 patent are valid.

C:\NrPortbl\PALIB1\RC2\3247898_3.DOC

Wilson Sonsini Goodrich & Rosati
PROFESSIONAL CORPORATION

Jonah Shacknai
December 20, 2007
Page 2


In order to dispel any dispute and the improper reach of this invalid patent, we request that Medicis promptly provide IMPAX with a covenant not to sue under the '838 patent, which extends to the filing of IMPAX's ANDA 90-024, as well as the commercial manufacture and sale of products under that ANDA. In order for you to further consider this proposal, we are willing to provide access to relevant portions of the ANDA, pursuant to an executed Offer of Confidential Access enclosed with this letter. We believe that a reasonable review of the facts will confirm that the use of the drugs for which IMPAX seeks approval is not covered by any valid claim of the '838 patent.

We are eager to reach a prompt resolution of these issues. If Medicis believes that it would be harmed by the manufacture or sale of minocycline HCl extended release tablets by IMPAX, addressing these issues at the present time would permit a prompt resolution to be reached before any such alleged harm could take place. If we do not hear from you promptly, we will assume that Medicis agrees that the drugs for which IMPAX seeks approval do not infringe any valid claim of the '838 patent, and that Medicis will not be harmed by the manufacture or sale of these products by IMPAX.

Sincerely,

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation

Roger J. Chin

## ABBREVIATED NEW DRUG APPLICATION 90-024
## OFFER OF CONFIDENTIAL ACCESS

**WHEREAS** IMPAX Laboratories, Inc. ("IMPAX") has provided notice to Medicis Pharmaceutical Corporation (hereinafter "Recipient") that IMPAX submitted to the U.S. Food and Drug Administration Abbreviated New Drug Application No. 90-024 for IMPAX's minocycline HCl extended release tablets (hereinafter referred to in whole or in part as the "ANDA"); and

**WHEREAS** this document constitutes IMPAX's Offer of Confidential Access to relevant portions of the ANDA; and

**WHEREAS** IMPAX offers to provide Recipient confidential access to relevant portions of the ANDA subject to restrictions as to persons entitled access to, and on the use and disposition of, the ANDA;

**NOW, THEREFORE**, IMPAX makes this offer:

1.    Subject to the restrictions recited in paragraph 2 below, IMPAX hereby provides Recipient this Offer of Confidential Access for the sole purpose of determining whether to assert a claim of patent infringement and/or provide a covenant not to sue under U.S. Patent No. 5,908,838.

2.    The right of confidential access offered herein is subject to the following restrictions as to persons entitled to access, and the use and disposition of any information accessed, pursuant to this Offer of Confidential Access:

    A.    **Persons Entitled to Access:**  Persons entitled to access (hereinafter referred to as "Authorized Evaluators") under this Offer of Confidential Access are restricted to outside counsel engaged by Recipient to represent Recipient and the staff of such outside counsel, including paralegal, secretarial and clerical personnel who are engaged in assisting such counsel, provided that:

        i.    Such outside counsel has been identified to IMPAX in writing;

        ii.    Such outside counsel is not involved in patent prosecution matters for Recipient;

        iii.    Within five (5) business days of receiving such written identification, IMPAX has not objected, in writing, to provision of confidential access to the identified outside counsel.

    B.    **Materials Accessible by Authorized Evaluators:**  A copy of relevant portions of the ANDA, redacted to remove information of no relevance to any issue of patent infringement, will be provided for use by Authorized Evaluators.

**C.      Use of the ANDA and Information in the ANDA:**

**i.**     Subject to paragraph 2(D)(ii)(a), use of the ANDA, and all information contained therein or derived therefrom, and all notes, analyses, studies, or documents prepared by Authorized Evaluators to the extent they reflect the contents of the ANDA furnished herein, is for the sole and limited purpose of evaluating possible infringement of U.S. Patent No. 5,908,838 and for no other purpose.

**ii.**    Authorized Evaluators shall not disclose any information contained in or derived from the ANDA or any notes, analyses, studies or other documents to the extent that they reflect any information in the ANDA, to any person other than an Authorized Evaluator.

**iii.**   Notwithstanding the provisions of subparagraphs 2(C)(i) and 2(C)(ii) above, Authorized Evaluators shall be permitted to advise Recipient on whether or not to assert a claim for patent infringement and/or provide a covenant not to sue under U.S. Patent No. 5,908,838, provided, however, that the information in the ANDA is not thereby disclosed.

**D.      Disposition of the Information in the ANDA:**

**i.**     If Recipient does not file an action for infringement of U.S. Patent No. 5,908,838 against IMPAX within thirty (30) days of receipt of the materials specified in paragraph 2(B) (the "30-day period"), Authorized Evaluators shall, and Recipient shall direct and ensure that Authorized Evaluators, within twenty (20) days after the expiration of the 30-day period, destroy or send to IMPAX the portions of the ANDA provided, and all notes, analyses, studies or other documents prepared or received by Authorized Evaluators to the extent that they reflect information in the ANDA, and Recipient or Authorized Evaluators shall notify IMPAX that this has been done.

**ii.**    Recipient agrees that if Recipient files an action for infringement of U.S. Patent No. 5,908,838 against IMPAX within thirty (30) days of receipt of the materials specified in paragraph 2(B):

**a.**     While the litigation is pending, the portions of the ANDA provided and all notes, analyses, studies or other documents prepared or received by Authorized Evaluators to the extent that they reflect information in the ANDA, shall be treated as information under the highest level of confidentiality under any protective order entered in the action brought against IMPAX.  Until such a protective order is entered, subsection 2(C)(ii) above continues to apply.

**b.**     Recipient shall direct and ensure that Authorized Evaluators destroy the portions of the ANDA provided and all notes, analyses, studies or other documents prepared or received by Authorized

-2-

Evaluators to the extent that they reflect information in the ANDA, within thirty (30) days after the final determination of the action brought against IMPAX.

iii. Notwithstanding the provisions of subparagraphs 2(D)(i) and 2(D)(ii) above, the Authorized Evaluators identified in subparagraph 2(A) shall be permitted to retain one copy of the portions of the ANDA provided and each note, analysis, study or other document prepared by Authorized Evaluators to the extent that they reflect information in the ANDA.

E. **Accidental Disclosure:** Should information from the ANDA be disclosed, inadvertently or otherwise, Recipient shall, at Recipient's earliest opportunity, contact IMPAX and identify:

i. What has been disclosed;

ii. The individuals to whom such information has been disclosed; and

iii. Steps taken by Recipient and Authorized Evaluators to ensure the information in the ANDA continues to be treated pursuant to the terms of this agreement and is not further disseminated.

3. Recipient and Authorized Evaluators recognize that violation of any provision of this Offer of Confidential Access will cause irreparable injury to IMPAX, and that an adequate legal remedy does not exist. IMPAX, therefore, shall have the right, in addition to any other remedies available at law or in equity, to obtain from a court of competent jurisdiction an injunction to prohibit Recipient and Authorized Evaluators from violating the terms of this Offer of Confidential Access. It is further agreed that in such an action IMPAX is entitled to recover any and all damages, costs and expenses, including, but not limited to, all reasonable attorneys' fees, professional fees and court costs.

4. Should any provision set forth in this Offer of Confidential Access be found by a court of competent jurisdiction to be illegal, unconstitutional and/or unenforceable, the remaining provisions shall continue in full force and effect.

5. Nothing contained herein shall be construed as a grant of any license or other right to use the information in the ANDA, except for the purpose expressly stated herein.

6. This Offer of Confidential Access shall be governed by the laws of the State of California, without giving effect to its conflicts of law or choice of law principles.

7. Each of Recipient, Authorized Evaluators and IMPAX, irrevocably submit to and accept, generally and unconditionally, the exclusive personal jurisdiction of the courts of the State of California, and of the U.S. District Court for the Northern District of California, waives its right to assert any objection or defense based on venue or forum non conveniens and agrees to be bound by any judgment rendered thereby arising under or in respect of this Offer of Confidential Access.

8.    When accepted by the parties hereto, this document shall constitute the entire agreement
of the parties with respect to the subject matter herein and may not be amended or
modified except in writing executed by all of the parties.

9.    An Authorized Evaluator may request access to the ANDA by executing one copy of this
Offer of Confidential Access where indicated and returning the executed copy to IMPAX
no later than January 4, 2008. Thereupon, the terms contained in this document shall be
considered an enforceable contract between IMPAX and the Recipient.

10.   This Offer of Confidential Access may be executed in two or more counterparts,
including by facsimile or scanned PDF copies, each of which shall be deemed an original
and all of which shall be deemed one and the same instrument.


IMPAX Laboratories, Inc.



Larry Hsu, President & CEO
Date: December 20, 2007


Recipient
By its authorized agent(s):


Signature: _____

Name (Print): _____

Title: _____

Company: _____

Date: _____, 2007

-4-

# Exhibit 2



**SETH L. RODNER**
Chief Compliance Officer

Direct Dial: (602) 296-2655
Direct Fax: (602) 778-6355
Email: srodner@medicis.com

January 11, 2008

**VIA FACSIMILE &
FEDERAL EXPRESS**

Mr. Roger J. Chin, Esq.
Wilson Sonsini Goodrich & Rosati
One Market Street
Spear Tower, Suite 3300
San Francisco, CA 94105-1126

**Re:    Minocycline HCl Extended Release Tablets**

Dear Mr. Chin:

Thank you for your letter of December 20, 2007 to Mr. Shacknai.

Please note that due to the holidays your letter only just came to my attention. I write to let you know that we will consider it and have a response to you within two weeks.

Respectfully submitted,

**MEDICIS PHARMACEUTICAL CORPORATION**

By:

Seth L. Rodner

SLR:lmg

# Exhibit 3

Slip Copy                                                                            Page 1
Slip Copy, 2007 WL 2022024 (N.D.Cal.)
**(Cite as: Slip Copy)**

C

Bridgelux, Inc. v. Cree, Inc.
N.D.Cal.,2007.
Only the Westlaw citation is currently available.
United States District Court,N.D. California.
BRIDGELUX, INC., Plaintiff,
v.
CREE, INC., et al., Defendants.
**No. C 06-6495 PJH.**

July 9, 2007.

Constance Faye Ramos, Henry C. Bunsow, Korula
T. Cherian, Robert F. Kramer, Amy Christine
Dachtler, Howrey Simon Arnold & White, LLP,
San Francisco, CA, for Plaintiff.
Christopher J. Cox, Matthew D. Powers, Christopher J. Cox, Matthew D. Powers, Weil Gotshal &
Manges, Redwood Shores, CA, for Defendants.

**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS IN PART AND DENYING IT IN PART**

PHYLLIS J. HAMILTON, United States District
Judge.
    **\*1** Before the court is defendants' motion to
dismiss the above-entitled action. Having read the
parties' papers and carefully considered their arguments, and good cause appearing, the court hereby
GRANTS the motion in part and DENIES it in part.

**BACKGROUND**

    Plaintiff BridgeLux, Inc. ("Bridge Lux"), a
California corporation based in Sunnyvale, California, manufactures LED (light-emitting diode) chips.
Defendant Cree, Inc. ("Cree"), a North Carolina
corporation headquartered in Durham, North Carolina, manufactures and sells various semiconductor
products, including LEDs, which it sells to lighting
companies. Defendant Cree Lighting Company was
formerly a subsidiary of Cree but was merged into
its parent company in 2003 and no longer exists as

a separate entity. Defendant Trustees of Boston
University ("BU") is the governing body of Boston
University, a non-profit educational institution located in Boston, Massachusetts.

    Cree owns U.S. Patent Nos. 6,657,236 ("the
'236 patent"); 6,614,056 ("the '056 patent");
6,885,036 ("the '036 patent"); and 6,600,175 ("the '
175 patent"). Boston University owns, and Cree exclusively licenses, U.S. Patent Nos. 5,686,738 ("the
'738 patent"); and 6,953,703 ("the '703 patent"). All
six patents relate to LED devices and materials.
BridgeLux, Cree, and BU are presently involved in
litigation involving some of these patents, in three
separate judicial districts.

    On September 11, 2006, Cree and BU filed suit
against BridgeLux in the Middle District of North
Carolina, alleging that BridgeLux had infringed
Cree's ' 236 patent and BU's '738 patent(*Cree v.
BridgeLux,* Case No. 06-cv-0761-NCT-RAE
(M.D.N.C.)).

    On October 17, 2006, BridgeLux did three
things. First, it filed a motion to dismiss the North
Carolina case for lack of personal jurisdiction and
improper venue. Second, it filed suit against Cree in
the Eastern District of Texas, alleging that Cree had
infringed U .S. Patent No. 6,869,812 ("the '812 patent"), owned by BridgeLux (*BridgeLux v. Cree,*
Case No. 06-cv-0240-RHC (E.D.Tex.)). Third, it
filed the present action, seeking a declaratory judgment of non-infringement and invalidity as to the
'236 and '738 patents, and seeking a declaratory
judgment of noninfringement as to the '175 and
'703 patents.

    In the North Carolina case, the court granted
defendants' motion for additional time to respond to
the motion to dismiss, and also granted their request for leave to conduct jurisdictional discovery.
The motion to dismiss was fully briefed as of April
13, 2007. On July 5, 2007, Magistrate Judge Russell A. Eliason issued a report and recommendation,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

recommending that the motion be granted.

In the Texas case, Cree and BU filed an answer and counterclaims, seeking a judicial declaration of non-infringement, invalidity, and unenforceability as to the '812 patent (first through third counterclaims); and a judicial declaration of infringement as to the '236, '738, '056, and '036 patents (fourth counterclaim).

**\*2** Shortly after filing their answer, defendants informally requested BridgeLux to agree to consolidate all the pending actions in the Eastern District of Texas. BridgeLux rejected this request. On December 4, 2004, defendants' counsel sent BridgeLux a letter on behalf of defendants, formally requesting that BridgeLux consider consolidating the three actions into the Texas case, to "serve the convenience of the parties" and "promote the just and efficient conduct issues involving the various patents." Counsel for BridgeLux declined, stating that "we see no recognizable efficiencies achieved by consolidating the parties' claims into a single action in Texas."

On December 28, 2006, BridgeLux moved in the Texas action for an order severing the fourth counterclaim. BridgeLux argued that the '238, '738, '056, and '036 patents were related to each other, and were distinct from and BridgeLux's '812 patent, the subject of the complaint. On January 16, 2007, Cree filed a motion for summary judgment of invalidity of the '812 patent. That motion has been fully briefed, but a decision has not yet been issued.

On February 5, 2007, the Texas court granted the motion to sever the fourth counterclaim in part and denied it in part, finding that the claims relating to the '236 and '738 patents were first filed in North Carolina, second filed in California, and third filed in Texas; and that the claims relating to the '056 and '036 patents were first filed in Texas and second filed in California.

The court severed the counterclaim as to the '236 and '738 patents, and dismissed that portion of the counterclaim, "to be dealt with by the court in which a suit involving these patents was first filed." At present, that court is the Middle District of North Carolina, where, however, BridgeLux claims it is not subject to suit. The court denied the motion to sever the counterclaim as to the '056 and '036 patents, on the basis that the claims regarding those patents were first filed in Texas.

In the present case, BridgeLux amended the complaint on November 28, 2006, adding counts for declaratory judgment of noninfringement as to the '056 and ' 036 patents. Defendants filed a motion to dismiss the entire action, to which BridgeLux filed an opposition. BridgeLux also requested leave to conduct jurisdictional discovery in order to oppose defendants' motion to dismiss BU for lack of personal jurisdiction, and to oppose the motion to dismiss the seventh and eighth causes of action for lack of subject matter jurisdiction. The court denied that request in an order issued on February 15, 2007.

## DISCUSSION

### A. Legal Standards

### 1. Subject Matter Jurisdiction

Subject matter jurisdiction is fundamental and cannot be waived. *Billingsly v. C.I.R.,* 868 F.2d 1081, 1085 (9th Cir.1989). Federal courts can adjudicate only those cases which the Constitution and Congress authorize them to adjudicate-those involving diversity of citizenship or a federal question, or those to which the United States is a party. *Kokkonen v. Guardian Life Ins. Co. of America,* 511 U.S. 375, 377, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994). The burden of establishing that a cause lies within this limited jurisdiction rests upon the party asserting jurisdiction. *Id.; see also Tosco Corp. v. Communities for a Better Env't,* 236 F.3d 495, 499 (9th Cir.2001).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 2022024 (N.D.Cal.)

**(Cite as: Slip Copy)**

### 2. Declaratory Judgment Act

**\*3** The Declaratory Judgment Act authorizes the court to "declare the rights and other legal relations of any interested party seeking such declaration" when there is an "actual controversy." 28 U.S.C. § 2201(a). In patent cases, declaratory judgment is usually sought by a party who, rather than waiting to be sued for patent infringement, seeks a legally binding affirmation that it is not infringing on another party's patent. *See, e.g., BP Chems. Ltd. v. Union Carbide Corp.,* 4 F.3d 975 (Fed.Cir.1993). Federal Circuit law controls such actions. *Shell Oil Co. v. Amoco Corp.,* 970 F.2d 885, 888 (Fed.Cir.1992).

The sole requirement for federal court jurisdiction under Article III of the U.S. Constitution and the Declaratory Judgment Act is an "actual controversy." *Teva Pharms. USA, Inc. v. Novartis Pharms. Corp.,* 482 F.3d 1330, 1338 (Fed.Cir.2007)(*"Novartis"* ) (citing *Aetna Life Ins. Co. v. Haworth,* 300 U.S. 227, 239-41, 57 S.Ct. 461, 81 L.Ed. 617 (1937)). Whether an actual controversy exists under the Declaratory Judgment Act in a patent case is a question of law for the court to decide. *Id.* at 1336.

The Federal Circuit formerly employed a two-part test for determining the existence of an actual controversy-the defendant's conduct must have created in the plaintiff an objectively reasonable apprehension that the defendant will initiate suit if the plaintiff continues the allegedly infringing activity, and the plaintiff must either have produced the infringing device or have prepared to produce it. *See Teva Pharms. USA, Inc. v. Pfizer, Inc.,* 395 F.3d 1324, 1332-33 (Fed.Cir.2005).

However, the Federal Circuit has now discarded that standard in the wake of the decision in *MedImmune, Inc. v. Genentech, Inc.,* --- U.S. ----, 127 S.Ct. 764, 166 L.Ed.2d 604 (2007), a patent licensing dispute. In that case, the Supreme Court stated, in dicta, that the Federal Circuit's two-prong "reasonable apprehension of imminent suit" test

conflicted with and "would contradict" several cases in which the Supreme Court had found that a declaratory judgment plaintiff had a justiciable controversy. *See id.,* 127 S.Ct. at 774 n. 11;*see also Novartis,* 482 F.3d at 1340;*SanDisk Corp. v. STMicroelectronics, Inc.,* 480 F.3d 1372, 1379 (Fed.Cir.2007). The Court stated that the "actual controversy" requirement of the Declaratory Judgment Act demands only

that the dispute be definite and concrete, touching the legal relations of parties having adverse legal interests; that it be real and substantial and admit of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.... The question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

**\*4** *MedImmune,* 127 S.Ct. at 771-72 (citations and quotations omitted).

In response to *MedImmune,* the Federal Circuit has adopted the "all circumstances" test in place of the discredited "reasonable apprehension of imminent suit" test. Under the *MedImmune* approach, a declaratory judgment plaintiff is required only to satisfy Article III, which includes standing and ripeness, by showing, under "all the circumstances," an actual or imminent injury caused by the defendant that can be redressed by judicial relief, and that is of "sufficient immediacy and reality to warrant the issuance of a declaratory judgment."*Novartis,* 482 F.3d at 1338 (quoting *MedImmune,* 127 U.S. at 771).

### B. Defendants' Motion to Dismiss

Defendants make two main arguments. First, they assert that the first, second, third, fourth, seventh, and eighth causes of action for declaratory relief should be dismissed under the first-to-file rule

because those claims were at issue in previously-filed lawsuits at the time this action was filed, and because BridgeLux has improperly used the Declaratory Judgment Act to forum-shop.

Second, they argue that the court lacks subject matter jurisdiction over the fifth and sixth causes of action for declaratory relief, because no actual and justiciable controversy existed between BridgeLux and defendants concerning the '175 and '703 patents at the time that BridgeLux filed this action.[FN1]

> FN1. Defendants originally also moved for an order dismissing BU for lack of personal jurisdiction, but BU subsequently consented to personal jurisdiction in this district for purposes of the present litigation only.

1. First, second, third, fourth, seventh, and eighth causes of action

BridgeLux's first and second causes of action seek a judicial declaration of non-infringement and invalidity of the '236 patent. The third and fourth causes of action seek a declaration of non-infringement and invalidity of the ' 738 patent. The seventh cause of action seeks a declaration of non-infringement of the '056 patent. The eighth cause of action seeks a declaration of non-infringement of the '036 patent.

Defendants argue that the court should decline to exercise jurisdiction over these six causes of action because they are duplicative of Cree's first-filed claims in North Carolina and Texas. The "first-to-file" rule is a generally recognized doctrine of federal comity which permits a district court to decline jurisdiction over an action when a complaint involving the same parties and issues has already been filed in another district. *Pacesetter Systems, Inc. v. Medtronic, Inc.,* 678 F.2d 93, 94-5 (9th Cir.1982). The Federal Circuit applies the general rule that " 'as a principle of sound judicial administration, the first suit should have priority,' absent special circumstances." *Kahn v. Gen'l Motors*

*Corp.,* 889 F.2d 1078, 1081 (Fed.Cir.1989) (citations omitted).

We apply the general rule favoring the forum of the first-filed case unless considerations of judicial and litigant economy, and the just and effective dispositions of disputes, requires otherwise. Exceptions are not rare, but we have explained that there must be sound reason that would make it unjust or inefficient to continue the first-filed action.

**\*5** *Electronics for Imaging, Inc. v. Coyle,* 394 F.3d 1341, 1347 (Fed.Cir.2005) (citation and quotation omitted).

In looking at this question, the court may consider whether a party filed a declaratory judgment action in an attempt to preempt another's infringement suit. Other factors include the convenience and availability of witnesses; the absence of jurisdiction over all necessary or desirable parties; and the possibility of consolidation with related litigation. *Id.* at 1347-48.

The Federal Circuit has not provided much additional guidance with regard to the application of the first-to-file rule. Courts in the Ninth Circuit look at three threshold factors: the chronology of the two actions; the similarity of the parties, and the similarity of the issues. *Alltrade, Inc. v. Uniweld Prods., Inc.,* 946 F.2d 622, 625-26 (9th Cir.1991); *Pacesetter,* 678 F.2d at 95;*Z-Line Designs, Inc. v. Bell'O Int'l, LLC,* 218 F.R.D. 663, 665 (N.D.Cal.2003). If the first-to-file rule does apply to a suit, the court in which the second suit was filed may transfer, stay or dismiss the proceeding in order to allow the court in which the first suit was filed to decide whether to try the case. *Alltrade,* 946 F.2d at 625. Defendants contend that all three of the above-cited factors are met with regard to the '236 and '738 patents, and also with regard to the '056 and '036 patents.

The court finds that the motion must be DENIED as to the '236 and '738 patents, and GRANTED as to the '056 and '036 patents. It is undisputed that the case involving the '236 and '738

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

patents was filed first in North Carolina, then in California; and that the case involving the '056 and '036 patents was filed first in Texas, then in California. [FN2] As it appears likely that the North Carolina court will dismiss the entire action pending before it for lack of personal jurisdiction over BridgeLux, this court will retain jurisdiction over the first through fourth causes of action. [FN3] However, because the Texas court has already ruled that the claims regarding the '056 and '036 patents should remain there, this court will dismiss the seventh and eighth causes of action under the first-to-file rule.

> FN2. Some months ago, the parties so agreed in the Texas action. *See* Order on Plaintiff's Motion to Sever, *BridgeLux v. Cree,* 06-CV-240 (E.D.Tex., Feb. 5, 2007).

> FN3. The court will reconsider this decision if the North Carolina court does *not* dismiss for lack of jurisdiction over BridgeLux, as the claims regarding the '236 and '738 patents were first filed in that district.

2. Fifth and sixth causes of action

Defendants argue that the fifth and sixth causes of action, seeking a declaration of non-infringement as to the '175 and '703 patents, should be dismissed for lack of subject matter jurisdiction because BridgeLux cannot show the existence of an actual controversy regarding those patents.

As discussed above, under the *MedImmune* test, a declaratory judgment plaintiff is required to show an actual and imminent injury caused by the defendant that can be redressed by judicial relief, and that is of "sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Novartis,* 482 F.3d at 1338 (quoting *MedImmune,* 127 U.S. at 771).

The *MedImmune* decision was issued on January 9, 2007, and the hearing on the present motion

occurred on January 31, 2007. In general, the arguments made by the parties in their briefs applied the old, pre-*MedImmune* Federal Circuit standard for determining subject matter jurisdiction over a declaratory judgment claim in a patent action. At the hearing, the court asked for supplemental briefing on the question of the effect, if any, of the *MedImmune* decision on the issues raised by defendants' motion.

**\*6** Defendants asserted that because the specific holding in *MedImmune* (a patent licensing case) has no application to the facts here, and because the Supreme Court's comments regarding the Federal Circuit's "reasonable apprehension of imminent suit" test were dicta, the decision should be read narrowly, and this court should not assume that the Court had rejected the Federal Circuit's long-standing test. BridgeLux, on the other hand, argued that the *MedImmune* test should be broadly applied, but also asserted that in any event, BridgeLux could meet either test.

The parties completed their supplemental briefing in late February 2007. Approximately a month later, the Federal Circuit issued its decisions in *SanDisk* and *Novartis,* in which it concluded that the Supreme Court had essentially rejected the "reasonable apprehension of imminent suit" test for determining declaratory judgment jurisdiction in patent cases, and that the broader general rules governing declaratory judgment jurisdiction also apply in patent cases.

BridgeLux argues that there is an actual and imminent injury that justified the filing of the present action for declaratory relief as to the '175 and ' 703 patents. Based on the Declaration of its Chief Executive Officer Robert C. Walker, BridgeLux asserts that it has an Asian-based customer (identified only as the "customer") who purchases LED chips from BridgeLux for use in its high-power LED products. BridgeLux is a major supplier of LED chips to this customer. Walker states that on April 23-27, 2006, the customer sponsored a booth at one of the major annual light-

ing trade shows, the Light & Building Frankfort 2006, in Germany. At that trade show, the customer displayed lighting products that incorporated BridgeLux's LED chips.

Walker asserts, on information and belief, that unidentified Cree management personnel approached the same Asian-based customer's booth at the trade show, and advised the customer's representative that if the customer was not using Cree's LED chips in its lighting products, then it was infringing certain of Cree's LED patents. Walker believes that the products to which the Cree representative directed its allegations of infringement all incorporated BridgeLux LED chips, and not Cree LEDs. However, Walker does not assert that the Cree representative indicated that he knew the products incorporated BridgeLux LED chips, or that the Cree representative ever mentioned BridgeLux.

Subsequently, in June 2006, the customer allegedly told Walker that Cree had sent it a warning letter asserting four U.S. patents directed to LED technologies and threatening that the customer's lighting products infringed those patents. According to Walker, the customer stated that Cree's letter was directed at the customer's products that incorporate BridgeLux's LED chips, and that the letter specifically named Cree's '738, '236, '703, and '175 patents. Upon receipt of the letter, the customer contacted BridgeLux and requested a meeting to discuss the patents and BridgeLux's position regarding potential infringement.

**\*7** The customer did not provide BridgeLux with a copy of the letter, and BridgeLux does not have a copy of the letter. Nevertheless, based on the customer's report of the comments by the Cree representative at the April 2005 trade show, and also based on the June 2006 letter, Walker asserts that BridgeLux became concerned that Cree might eventually assert those four patents against BridgeLux.

In September 2006, Cree did file suit in the Middle District of North Carolina, asserting infringement as to two of the four patents (the '738 and '236 patents) that had allegedly been identified in the June 2006 letter to the Asian-based customer. Thus, according to Walker, BridgeLux reasonably believed that another lawsuit asserting the other two patents (the '703 and '175 patents) was imminent.

Walker states further that he is informed that Cree has made "comments" to other customers or potential customers regarding the competition that BridgeLux is presenting to Cree in the LED market. According to Walker, a BridgeLux sales manager was told by a potential customer that in 2006, Cree management personnel told the potential customer that Cree considered BridgeLux to be a major supplier of InGaN power LEDs in the market, and that Cree's sales performance on certain of its products was affected by competition presented by BridgeLux's LED chips.

Walker also claims that "some current and potential customers" have told BridgeLux that they are apprehensive of using BridgeLux LEDs in their lighting products because they fear being sued by Cree. Walker asserts that this has caused BridgeLux to be concerned and to feel threatened that Cree will assert its LED patents directly against BridgeLux.

In 2004, Walker served as the co-chair of Blue 2004, a lighting conference held in Taiwan and attended by major participants in the lighting field including BridgeLux customers and potential customers who make and sell lighting products that use LED chips. Walker states that at that conference, a Cree senior manager (unidentified) addressed the attendees, and projected a copy of Cree's '175 patent during his presentation.

According to Walker, the Cree manager discussed various products (tennis shoes, flashlights) which he had purchased in North Carolina and which incorporated LEDs, and stated his opinion that the products infringed Cree's '175 patent be-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 2022024 (N.D.Cal.)
**(Cite as: Slip Copy)**

cause they did not use the Cree LED die and did not have a license with Cree. The Cree manager stated that the '175 patent had broad coverage, and indicated that Cree would bring lawsuits to enforce its patent.

Walker states further that he is aware the Cree and BU have in the past filed patent infringement lawsuits. He also attaches to his declaration copies of Cree press releases dated May 19, 2005, December 8, 2005, May 9, 2006, and September 28, 2006, announcing Cree's licensing of its '175 patent to various companies located in Japan, Hong Kong, Korea, and Taiwan. Walker asserts that these press releases promote the '175 patent and explain Cree's intention to defend its technology.

**\*8** Defendants, on the other hand, argue that at the time the present action was filed, no actual controversy existed between the parties regarding the '175 and '703 patents, and contend that BridgeLux has not met its burden of showing that an actual controversy in fact existed. Based on the declaration of John F. Imbergamo, BU's Senior Associate Vice President of Financial Affairs, defendants contend that no employee of BU has ever told BridgeLux or a third party that BridgeLux has infringed the '703 patent, and that no employee of BU has ever threatened BridgeLux with suit on the '703 patent. BridgeLux does not dispute this claim.

Defendants assert further, based on the declaration of Scott S. Schwab, Vice-President and General Manager of Optoelectronics at Cree, that while Cree has offered to license the '703 patent on behalf of BU to other companies, neither Cree nor BU has ever brought suit on the '703 patent against any company. Schwab also claims, on information and belief, that no employee of Cree has ever told BridgeLux or a third party that BridgeLux has infringed either the '703 patent or the '175 patent, and that no employee of Cree has ever threatened BridgeLux with suit on either of those patents.

Defendants contend that BridgeLux has not met its burden of showing the existence of an actual

controversy regarding the '175 or '703 patents at the time this action was filed, because the evidence on which BridgeLux relies is inadmissible. Defendants assert that the only evidence provided is the declaration of Robert Walker, BridgeLux's CEO. Defendants argue that the Walker declaration is based primarily on inadmissible hearsay and rumors, noting in particular that the assertions concerning Cree's supposed allegations of infringement are based on several layers of hearsay.

For example, defendants point to Walker's statement that an unidentified Cree representative allegedly approached an unidentified Asian-based customer of BridgeLux at an April 2004 trade show in Germany, and advised this customer that if it was not using Cree LED chips, it was infringing certain of Cree's patents. Similarly, defendants note Walker's claim that an unidentified representative of the unidentified Asian-based customer stated in June 2006 that an unidentified representative of Cree had sent the customer a warning letter asserting four patents directed to LED technologies and threatening that the Asian-based customer's lighting products infringed those patents.

Defendants note that Walker concedes that BridgeLux was never provided with a copy of the letter and was never able to verify the exact contents of Cree's purportedly threatening comments. Defendants assert that Walker's claims are based on an out-of-court statement by an unidentified representative of an unidentified Asian-based customer, which in turn was based on an out-of-court statement (the letter) by an unidentified representative of Cree. Defendants contend that, at best, this is double hearsay, although they also note that there is no way of knowing how many people the information about the letter passed through before reaching Walker.

**\*9** Defendants also contend that Walker's statements are impermissibly vague about the source of his information and when he became aware of it. Defendants argue that the "evidence" provided by BridgeLux is inadmissible, and as such, cannot be

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

used to establish that the court has subject matter jurisdiction because it does not constitute proof that Cree made actual threats of suit.

Defendants argue further that even if the statements in the Walker declaration were admissible and reliable, they would still not constitute evidence sufficient to show the existence of an actual controversy. They note that BridgeLux provides no evidence showing that either Cree or BU has ever sued anyone on these two patents; that either Cree or BU has ever threatened BridgeLux with suit; that the unidentified Cree representative at the trade show specifically alleged infringement of either the '175 or '703 patents, ever mentioned BridgeLux, or appeared to know whether the unidentified Asian customer's products contained BridgeLux chips; or that the letter supposedly sent by Cree to the unidentified Asian customer ever mentioned BridgeLux.

The court finds that BridgeLux has not met its burden of providing admissible evidence of an actual and imminent injury caused by Cree and BU that can be redressed by judicial relief, and that is of "sufficient immediacy and reality to warrant the issuance of a declaratory judgment."

It is undisputed that neither defendant had filed any lawsuit alleging infringement of the '175 or '703 patents, and that neither defendant has ever accused BridgeLux of infringing the patents. The statements in the Walker declaration are hearsay or double hearsay, and cannot be admitted into evidence to support BridgeLux's claim that an "actual controversy" existed with regard to the '175 or '703 patents at the time the present action was filed.

Moreover, even if the statements in the Walker declaration were not hearsay, they are not sufficiently "definite and concrete" to warrant a conclusion that defendants had inflicted an "actual and imminent injury" on BridgeLux. There is no indication that anyone from Cree ever specifically identified BridgeLux as having infringed the '175 or '703 patents, even in complaints to third parties. The fact

that Cree stated publicly in press releases or at industry meetings that it would defend its patents is unremarkable. The same could be said of many patent-holders.

### CONCLUSION

In accordance with the foregoing, the court DENIES the motion to dismiss the first through fourth causes of action, seeking a declaratory judgment of noninfringement and invalidity involving the '236 and '738 patents; and GRANTS the motion to dismiss the fifth through eighth causes of action, seeking a declaratory judgment of noninfringement as to the '175, '703, '056, and '036 patents.

The court will conduct a case management conference in this case on Thursday, August 16, 2007, at 2:30 p.m.

**\*10 IT IS SO ORDERED.**

N.D.Cal.,2007.
Bridgelux, Inc. v. Cree, Inc.
Slip Copy, 2007 WL 2022024 (N.D.Cal.)

END OF DOCUMENT

# Exhibit 4

Slip Copy                                                            Page 1
Slip Copy, 2007 WL 1974951 (S.D.Ohio)
(Cite as: Slip Copy)

▷

Prasco, LLC v. Medicis Pharmaceutical Corp.
S.D.Ohio,2007.
Only the Westlaw citation is currently available.
United States District Court,S.D. Ohio,Western Division.
PRASCO, LLC, Plaintiff,
v.
MEDICIS PHARMACEUTICAL CORP., et al.,
Defendants.
No. 1:06cv313.

July 3, 2007.

John David Luken, Joshua Allen Lorentz, Dinsmore & Shohl, Cincinnati, OH, Amy Denise Brody, Deanne M. Mazzochi, William Andrew Rakoczy, Rakoczy, Molino, Mazzochi, Siwik, LLP, Chicago, IL, for Plaintiff.
Kenneth Franklin Seibel, Jacobs, Kleinman, Seibel & McNally, Cincinnati, OH, Barry J. Coyne, Reed Smith LLP, Pittsburgh, PA, for Defendants.

### ORDER

MICHAEL R. BARRETT, United States District Judge.

*1 This matter is before the Court Plaintiff Prasco's Motion to Alter or Amend. (Doc. 34) Defendants Medicis Pharmaceutical Corporation ("Medicis") and Imaginative Research Associates, Inc.'s ("Imaginative") have filed a Response in Opposition (Doc. 35), and Prasco has filed a Reply (Doc. 36). This matter is now ripe for review.

## I.  *FACTUAL AND PROCEDURAL BACKGROUND*

Defendant Medicis manufactures and markets the product TRIAZ. This product has four patents associated with it: U.S. Patent Nos. 5,254,334 ('334); 5,409,706 ('706); 5,632,996 ('996); and 5,648,389 ('389). Medicis is the assignee for the '389 patent and is the licensee for the '334, '706,

and '996 patents. Defendant Imaginative is the assignee for the '334, '706, and '996 patents, and licenses these patents to Medicis.[FN1] TRIAZ is an acne cleanser containing benzoyl peroxide in the concentrations 3%, 6%, and 9%. Medicis commercially markets TRIAZ as being covered by the patents-in-suit, and labels the packaging and labeling with these patent numbers.

> FN1. The parties dispute whether Medicis, as licensee, would have the right to enforce the three Imaginative patents. The Court once again finds it unnecessary to reach this issue given the disposition of this motion.

On May 5, 2006, Prasco filed its Complaint for declaratory judgment, seeking a declaration that its product OSCION has not infringed, does not infringe, and will not infringe any valid and enforceable claim of the patents-in-suit. OSCION is a generic acne cleanser also containing benzoyl peroxide in the concentrations 3%, 6%, and 9%. OSCION is designed as a fully substitutable generic alternative to TRIAZ and intended to compete directly with it. Prior to the filing of the declaratory action, Prasco had not begun to market OSCION, and Defendants had no knowledge of Prasco's product. (Doc. 15, Ex. 1, Brandon Hokenstad Decl. ¶ 3; Doc. 15, Ex. 2, Mohan Vishnupad Decl. ¶¶ 4-5)

Defendants moved to dismiss Prasco's Complaint, arguing that this Court lacked subject matter jurisdiction because Prasco had not sufficiently alleged a case or controversy. Prasco responded by filing an Amended Complaint, which states that on June 14, 2006, Prasco commercially launched OSCION. (Doc. 17 ¶ 29). Prasco alleged that on July 28, 2006, it provided Medicis and Imaginative with a sample of OSCION, its related labeling, and an ingredient list. (*Id.* ¶ 31) Prasco also alleged that on July 28, 2006 it requested from Medicis and Imaginative a covenant not to sue relating to the '334, '706, '996, and '389 patents; but Medicis and Ima-

ginative have refused this request. (*Id.* ¶¶ 35-38) Defendants moved to dismiss the Amended Complaint.

In ruling upon Defendants' Motions to Dismiss, this Court found that based on the facts alleged in the Amended Complaint, Prasco had not alleged conduct sufficient to objectively establish a "reasonable apprehension of suit" by Defendants, and therefore the Court did not have subject matter jurisdiction over Prasco's claims. In a footnote, the Court also noted that even if the reasonable apprehension of suit test is no longer good law, there is no actual case or controversy present based upon the facts in the record.

## II. *ANALYSIS*

### A. *otion to Alter or Amend*

**\*2** Prasco brings its motion pursuant to Federal Rule of Civil Procedure 59(e). Under this Rule, there are three grounds for amending a judgment: (1) to accommodate an intervening change in controlling law; (2) to account for new evidence not available at trial; and (3) to correct a clear error of law or to prevent manifest injustice. *GenCorp., Inc. v. Am. Int'l Underwriters,* 178 F.3d 804, 834 (6th Cir.1999); *Berridge v. Heiser,* 993 F.Supp. 1136, 1146-47 (S.D.Ohio 1997). However, "[a] motion under Rule 59(e) is not an opportunity to re-argue a case." *Sault Ste. Marie Tribe of Chippewa Indians v. Engler,* 146 F.3d 367, 374 (6th Cir.1998).

Prasco's motion is based upon an intervening change in controlling law. Prasco argues that a Federal Circuit decision issued three days after this Court's Order indicates that the United States Supreme Court overruled the "reasonable apprehension of suit test" in *MedImmune, Inc. v. Genetech, Inc., et al,* 127 S.Ct. 764 (January 9, 2007).*See Teva Pharms. USA, Inc. v. Novartis Pharms. Corp.,* 482 F.3d 1330, 1339 (Fed.Cir. Mar. 30, 2007).[FN2]

> FN2. As the Federal Circuit acknowledges, this Court was bound by Federal Circuit

precedent to apply the reasonable apprehension of suit test. *See Teva,* 482 F.3d at 1339.

### A. *The Reasonable Apprehension of Suit Test*

In *MedImmune,* the Supreme Court stated that the Federal Circuit's "reasonable apprehension of suit" test contradicts earlier Supreme Court precedent. 127 S.Ct. at 774, n. 11. This Court found that while the Court's decision may call into doubt the use of the "reasonable apprehension of suit" test, it did not overrule the line of cases that rely upon the "reasonable apprehension of suit" test. *Accord BridgeLux, Inc. v. Cree, Inc,* No. 06-6495, 2007 WL 521237, at \*2 (N.D.Cal. Feb. 15, 2007) (slip op.);*WS Packaging Group, Inc. v. Global Commerce Group, LLC,* No. 06-674, 2007 WL 205559, at \*3 (E.D.Wisc. Jan. 24, 2007) (slip op.). The Federal Circuit has since determined that the Supreme Court's analysis in *MedImmune* is the proper approach. *See Teva Pharmaceuticals USA, Inc. v. Novartis Pharmaceuticals Corp.,* 482 F.3d 1330, 1338 (Fed.Cir. March 30, 2007). Under this approach, a declaratory judgment plaintiff must show that under "all the circumstances" an actual or imminent injury caused by the defendant that can be redressed by judicial relief and that is of "sufficient immediacy and reality to warrant the issuance of a declaratory judgment."*Id.* at 1338,*quoting MedImmune,* 127 S.Ct. at 771. An "actual controversy" requires only that a dispute be " 'definite and concrete, touching the legal relations of parties having adverse legal interests'; and that it be 'real and substantial' and 'admi[t] of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical set of facts.' " *Id.* at 1339,*quoting MedImmune,* 127 S.Ct. at 771.

In *Teva,* the court determined that when taken as a whole, the five grounds alleged by the plaintiff were sufficient to establish a justiciable controversy. *Id.* at 1341.First, the defendant listed its five related patents in the Food and Drug Administration's Orange Book, which the court recognized as a

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

representation by the defendant that a claim of patent infringement could reasonably be asserted against a person not licensed by the owner. *Id.* Second, the plaintiff submitted its Abbreviated New Drug Application ("ANDA") certifying that it did not infringe the defendant's Orange Book patents or that the patents were invalid. *Id.* at 1342.The court noted that the very act of submitting an ANDA is an act of infringement. *Id.* Third, the court noted that the defendant had filed an infringement lawsuit on only one of its five patents listed in the Orange book. *Id.* at 1343.The court found that the defendant's actions insulated its other four patents from a validity challenge, and frustrated the central purpose of the Hatch-Waxman Act of bringing cheaper generic drugs to market as quickly as possible. *Id.* at 1343-44.Fourth, the court found that the defendant's pending infringement litigation "involving the same technology and the same parties is relevant to determining whether a justiciable declaratory judgment controversy exists on other related patents."*Id.* at 1344-45,*citing Vanguard Research, Inc. v. PEAT, Inc.,* 304 F.3d 1249, 1255 (Fed.Cir.2002) (finding a justiciable declaratory judgment controversy where the defendant had sued the declaratory judgment plaintiff for misappropriation of trade secrets thereby demonstrating "a willingness to protect [its] technology."); *Goodyear Tire & Rubber Co. v. Releasomers, Inc.,* 824 F.2d 953, 955 (Fed.Cir.1987) (finding a justiciable declaratory judgment controversy in a patent non-infringement and invalidity action where the defendant had sued the declaratory judgment plaintiff in state court for misappropriation of trade secrets involving the same technology, thereby engaging in "a course of conduct that shows a willingness to protect that technology.").[FN3] Finally, the court noted that the defendant's election to sue on only one of its five related patents left open the possibility of future litigation. *Id.* at 1345.The court explained that even if the plaintiff is successful in defending the pending infringement suit, it remains subject to four additional infringement actions by the defendant, which could result in protracted litigation. *Id.*

FN3. As the court explained:

A justiciable declaratory judgment controversy arises for an ANDA filer when a patentee lists patents in the Orange Book, the ANDA applicant files its ANDA certifying the listed patents under paragraph IV, and the patentee brings an action against the submitted ANDA on one or more of the patents. The combination of these three circumstances is dispositive in establishing an actual declaratory judgment controversy as to all the paragraph IV certified patents, whether the patentee has sued on all or only some of the paragraph IV certified patents.

482 F.3d at 1344.

**\*3** Prasco attempts to bring the facts alleged in the Amended Complaint within the holding of *Teva.*Prasco argues that the following circumstances establish that there is an actual controversy between the parties: (1) Defendants have marked the patents-in-suit on Medicis' product; (2) Medicis has previously sued Prasco for infringement of a patent for a similar product; and (3) Defendants are unwilling to provide Prasco with a covenant not-to-sue.

The Court finds that these facts, unlike the circumstances in *Teva,* do not establish an actual controversy. Even if the Court were to find that the marking of products with the patents-in-suit is analogous to a listing of patents in the Orange Book, the court in *Teva* was clear that this conduct alone is not sufficient to establish an Article III controversy. 482 F.3d at 1341-42. In *Teva,* the court found dispositive that the plaintiff was an ANDA filer, the defendant had listed patents in the Orange Book, the plaintiff had filed its ANDA certifying the listed patents under paragraph IV, and the defendant brought an action against the submitted ANDA on one or more of the patents. *Id.* at 1344.None of these circumstances exist in the present case. The only litigation which Prasco can point to is the Arizona infringement suit Medicis filed against Prasco and another generic company.FN4That litigation involved a different

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

product-Prasco's PRASCION product-and a different patent owned by Medicis. Prasco has not alleged that the Arizona litigation involved the same technology as the patents in this action. Without this connection, the Court cannot conclude that the Arizona litigation demonstrates any possibility of future litigation.

> FN4. On October 27, 2005 Medicis filed a complaint against Prasco and another generic company in federal court in Arizona seeking a declaration that Prasco's product PRASCION infringed another of Medicis' patents. (Doc. 17, ¶ 40)

Finally, the Court finds that Medicis' refusal grant a covenant not to sue holds little weight under the circumstances. While Defendants have not conceded non-infringement, Prasco cannot point to any statements by Defendants indicating that Defendants take a position that Prasco's OSCION product infringes the patents-in-suit. In contrast, in *Sandisk Corp. v. STMicroelectronics, Inc.,* 480 F.3d 1372, 1382 (Fed.Cir.2007), the declaratory judgment plaintiff alleged that the defendant sought a royalty under its patents based on specific, identifiable activity by the plaintiff. The parties had engaged in licensing negotiations, during which the defendant presented the plaintiff with a thorough infringement analysis prepared by seasoned litigation experts. *Id.* The court found that despite the defendant's promise not to sue, its acts did not render moot the actual controversy created by its acts.*Id.* at 1383.The court concluded that under the facts alleged, the plaintiff had established an Article III case or controversy that gives rise to declaratory judgment jurisdiction. *Id.* at 1382.Here, Prasco has not alleged that Defendants have initiated discussions regarding licensing or made any statements regarding infringement. Without such facts, the Court cannot find that under all the circumstances, Prasco has shown that there is a substantial controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

**\*4** Therefore, the Court **DENIES** Plaintiff

Prasco's Motion to Alter or Amend (Doc. 34); and this case shall remain **CLOSED.**

   **IT IS SO ORDERED.**

S.D.Ohio,2007.
Prasco, LLC v. Medicis Pharmaceutical Corp.
Slip Copy, 2007 WL 1974951 (S.D.Ohio)

END OF DOCUMENT