1  RON E. SHULMAN, State Bar No. 178263
   ROGER J. CHIN, State Bar No. 184662
2  JENNIFER KOH, State Bar No. 238653
   WILSON SONSINI GOODRICH & ROSATI
3  Professional Corporation
   650 Page Mill Road
4  Palo Alto, CA 94304-1050
   Telephone:  (650) 493-9300
5  Facsimile:   (650) 565-5100
   Email:  rchin@wsgr.com
6
   Attorneys for Plaintiff
7  IMPAX LABORATORIES, INC.

8                  UNITED STATES DISTRICT COURT

9                NORTHERN DISTRICT OF CALIFORNIA

10                   SAN FRANCISCO DIVISION

11

12  IMPAX LABORATORIES, INC.,              CASE NO.:  C08-0253-MMC

13          Plaintiff,                     **DECLARATION OF ROGER J. CHIN
                                           IN SUPPORT OF IMPAX'S
14      v.                                 OPPOSITION TO MEDICIS'S
                                           MOTION TO DISMISS**
15  MEDICIS PHARMACEUTICAL CORP.,
                                           Date:     April 11, 2008
16          Defendant.                     Time:     9:00 a.m.
                                           Before:  Hon. Maxine M. Chesney
17

18

19

20

21

22

23

24

25

26

27

28

1    I, Roger J. Chin, declare as follows:

2    1.    I am a member of the law firm of Wilson Sonsini Goodrich & Rosati, counsel to

3    plaintiff Impax Laboratories, Inc.  I have personal knowledge of the facts set forth below.

4    2.    Attached as Exhibit A is a true and correct copy of my letter to Jonah Shacknai,

5    dated December 20, 2007, which was sent on that day by Federal Express for overnight delivery.

6    3.    Attached as Exhibit B is a true and correct copy of pages from Medicis

7    Pharmaceutical Corp.'s Form 10-Q, dated November 9, 2007, downloaded from the SEC's

8    Electronic Data Gathering, Analysis, and Retrieval (EDGAR) system.  Relevant portions of this

9    document have been highlighted.

10    4.    Attached as Exhibit C is a true and correct copy of pages from Medicis

11    Pharmaceutical Corp.'s Form 10-K, dated February 29, 2008, downloaded from the SEC's

12    Electronic Data Gathering, Analysis, and Retrieval (EDGAR) system.  Relevant portions of this

13    document have been highlighted.

14    5.    Attached as Exhibit D is a true and correct copy of Prescribing Information for

15    Solodyn®, downloaded from Medicis's web site.  Relevant portions of this document have been

16    highlighted.

17    6.    Attached as Exhibit E is a true and correct copy of press release entitled "Medicis

18    Reports First Quarter 2007 Financial Results," dated May 8, 2007, downloaded from Medicis's

19    web site.  Relevant portions of this document have been highlighted.

20

21    7.    Attached as Exhibit F is a true and correct copy of pages from the transcript of the

22    Q4 2006 Medicis Earnings Conference Call, dated February 28, 2007.  Relevant portions of this

23    document have been highlighted.

24    8.    Attached as Exhibit G is a true and correct copy of pages from the transcript of the

25    Deutsche Bank 32nd Annual Health Care Conference, dated May 3, 2007.  Relevant portions of

26    this document have been highlighted.

27

28

9.    Attached as Exhibit H is a true and correct copy of pages from the transcript of the Morgan Stanley Global Healthcare Unplugged Conference, dated May 4, 2007.  Relevant portions of this document have been highlighted.

10.    Attached as Exhibit I is a true and correct copy of pages from the transcript of the Wachovia Securities 2007 Nantucket Equity Conference, dated June 27, 2007.  Relevant portions of this document have been highlighted.

11.    Attached as Exhibit J is a true and correct copy of pages from the transcript of the Thomas Weisel 2007 Healthcare Conference, dated September 6, 2007.  Relevant portions of this document have been highlighted.

12.    Attached as Exhibit K is a true and correct copy of pages from the transcript of the Credit Suisse Healthcare Conference, dated November 14, 2007.  Relevant portions of this document have been highlighted.

13.    Attached as Exhibit L is a true and correct copy of pages from the transcript of the Morgan Stanley Pharmaceutical CEOs Unplugged Conference, dated January 4, 2008.  Relevant portions of this document have been highlighted.

14.    Attached as Exhibit M is a true and correct copy of pages from the transcript of the Merrill Lynch 19th Global Pharmaceutical, Biotechnology & Medical Device Conference, dated February 7, 2008.  Relevant portions of this document have been highlighted.

15.    Attached as Exhibit N is a true and correct copy of Pub. L. No. 105-115 § 125, downloaded from the U.S. Government Printing Office's GPO Access system.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on March 21, 2008, at San Francisco, California.

Roger J. Chin



One Market Street
Spear Tower, Suite 3300
San Francisco, CA 94105-1126
PHONE 415.947.2000
FAX 415.947.2099
www.wsgr.com

December 20, 2007

Jonah Shacknai
Chief Executive Officer
Medicis Pharmaceutical Corporation
8125 North Hayden Road
Scottsdale, Arizona 85258

**Re:      Minocycline HCl Extended Release Tablets**

Dear Mr. Shacknai:

I write on behalf of IMPAX Laboratories, Inc. to inform Medicis Pharmaceutical Corp. that IMPAX has submitted an ANDA under section 505(j) of the Federal Food, Drug, and Cosmetic Act, in order to obtain approval to commercially manufacture and sell minocycline HCl extended release tablets.

The drugs for which IMPAX seeks approval have the same active ingredient, route of administration, dosage form, and strength as those of 45 mg, 90 mg, and 135 mg SOLODYN™ extended release tablets. Additionally, they are bioequivalent to SOLODYN™ extended release tablets, and they will have labeling that is the same as the labeling approved for SOLODYN™ extended release tablets, except for changes required because they will be produced and distributed by a different manufacturer.

We have noted that U.S. Patent No. 5,908,838 is listed on the Prescribing Information for SOLODYN™ extended release tablets. Furthermore, Medicis has asserted in its recent SEC Form 10-Q that a generic competitor to SOLODYN™ faces "the risk of a suit for patent infringement." These statements suggest that Medicis intends to enforce the '838 patent against products that are used in the same manner as SOLODYN™, and that Medicis further seeks to stifle competition in the market for minocycline HCl extended release tablets. These efforts are clearly improper, since the claims of the '838 patent issued only because the patent examiner was not aware of highly relevant prior art during prosecution of the '838 patent.

If Medicis were to attempt to enforce the '838 patent against IMPAX, we believe such an effort would be objectively and subjectively baseless, and would give rise to potential antitrust liability. Indeed, even marking the '838 patent on the Prescribing Information for SOLODYN™ may be actionable without a good faith basis for concluding that the claims of the '838 patent are valid.

AUSTIN    NEW YORK    PALO ALTO    SAN DIEGO    SAN FRANCISCO    SEATTLE    SHANGHAI    WASHINGTON, D.C.

Wilson Sonsini Goodrich & Rosati
PROFESSIONAL CORPORATION

Jonah Shacknai
December 20, 2007
Page 2


In order to dispel any dispute and the improper reach of this invalid patent, we request that Medicis promptly provide IMPAX with a covenant not to sue under the '838 patent, which extends to the filing of IMPAX's ANDA 90-024, as well as the commercial manufacture and sale of products under that ANDA. In order for you to further consider this proposal, we are willing to provide access to relevant portions of the ANDA, pursuant to an executed Offer of Confidential Access enclosed with this letter. We believe that a reasonable review of the facts will confirm that the use of the drugs for which IMPAX seeks approval is not covered by any valid claim of the '838 patent.

We are eager to reach a prompt resolution of these issues. If Medicis believes that it would be harmed by the manufacture or sale of minocycline HCl extended release tablets by IMPAX, addressing these issues at the present time would permit a prompt resolution to be reached before any such alleged harm could take place. If we do not hear from you promptly, we will assume that Medicis agrees that the drugs for which IMPAX seeks approval do not infringe any valid claim of the '838 patent, and that Medicis will not be harmed by the manufacture or sale of these products by IMPAX.

Sincerely,

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation

Roger J. Chin

## ABBREVIATED NEW DRUG APPLICATION 90-024
## OFFER OF CONFIDENTIAL ACCESS

**WHEREAS** IMPAX Laboratories, Inc. ("IMPAX") has provided notice to Medicis Pharmaceutical Corporation (hereinafter "Recipient") that IMPAX submitted to the U.S. Food and Drug Administration Abbreviated New Drug Application No. 90-024 for IMPAX's minocycline HCl extended release tablets (hereinafter referred to in whole or in part as the "ANDA"); and

**WHEREAS** this document constitutes IMPAX's Offer of Confidential Access to relevant portions of the ANDA; and

**WHEREAS** IMPAX offers to provide Recipient confidential access to relevant portions of the ANDA subject to restrictions as to persons entitled access to, and on the use and disposition of, the ANDA;

**NOW, THEREFORE**, IMPAX makes this offer:

1.  Subject to the restrictions recited in paragraph 2 below, IMPAX hereby provides Recipient this Offer of Confidential Access for the sole purpose of determining whether to assert a claim of patent infringement and/or provide a covenant not to sue under U.S. Patent No. 5,908,838.

2.  The right of confidential access offered herein is subject to the following restrictions as to persons entitled to access, and the use and disposition of any information accessed, pursuant to this Offer of Confidential Access:

    A.  **Persons Entitled to Access:** Persons entitled to access (hereinafter referred to as "Authorized Evaluators") under this Offer of Confidential Access are restricted to outside counsel engaged by Recipient to represent Recipient and the staff of such outside counsel, including paralegal, secretarial and clerical personnel who are engaged in assisting such counsel, provided that:

        i.   Such outside counsel has been identified to IMPAX in writing;

        ii.  Such outside counsel is not involved in patent prosecution matters for Recipient;

        iii. Within five (5) business days of receiving such written identification, IMPAX has not objected, in writing, to provision of confidential access to the identified outside counsel.

    B.  **Materials Accessible by Authorized Evaluators:** A copy of relevant portions of the ANDA, redacted to remove information of no relevance to any issue of patent infringement, will be provided for use by Authorized Evaluators.

**C.    Use of the ANDA and Information in the ANDA:**

    **i.**    Subject to paragraph 2(D)(ii)(a), use of the ANDA, and all information contained therein or derived therefrom, and all notes, analyses, studies, or documents prepared by Authorized Evaluators to the extent they reflect the contents of the ANDA furnished herein, is for the sole and limited purpose of evaluating possible infringement of U.S. Patent No. 5,908,838 and for no other purpose.

    **ii.**    Authorized Evaluators shall not disclose any information contained in or derived from the ANDA or any notes, analyses, studies or other documents to the extent that they reflect any information in the ANDA, to any person other than an Authorized Evaluator.

    **iii.**    Notwithstanding the provisions of subparagraphs 2(C)(i) and 2(C)(ii) above, Authorized Evaluators shall be permitted to advise Recipient on whether or not to assert a claim for patent infringement and/or provide a covenant not to sue under U.S. Patent No. 5,908,838, provided, however, that the information in the ANDA is not thereby disclosed.

**D.    Disposition of the Information in the ANDA:**

    **i.**    If Recipient does not file an action for infringement of U.S. Patent No. 5,908,838 against IMPAX within thirty (30) days of receipt of the materials specified in paragraph 2(B) (the "30-day period"), Authorized Evaluators shall, and Recipient shall direct and ensure that Authorized Evaluators, within twenty (20) days after the expiration of the 30-day period, destroy or send to IMPAX the portions of the ANDA provided, and all notes, analyses, studies or other documents prepared or received by Authorized Evaluators to the extent that they reflect information in the ANDA, and Recipient or Authorized Evaluators shall notify IMPAX that this has been done.

    **ii.**    Recipient agrees that if Recipient files an action for infringement of U.S. Patent No. 5,908,838 against IMPAX within thirty (30) days of receipt of the materials specified in paragraph 2(B):

        **a.**    While the litigation is pending, the portions of the ANDA provided and all notes, analyses, studies or other documents prepared or received by Authorized Evaluators to the extent that they reflect information in the ANDA, shall be treated as information under the highest level of confidentiality under any protective order entered in the action brought against IMPAX. Until such a protective order is entered, subsection 2(C)(ii) above continues to apply.

        **b.**    Recipient shall direct and ensure that Authorized Evaluators destroy the portions of the ANDA provided and all notes, analyses, studies or other documents prepared or received by Authorized

Evaluators to the extent that they reflect information in the ANDA, within thirty (30) days after the final determination of the action brought against IMPAX.

    **iii.**    Notwithstanding the provisions of subparagraphs 2(D)(i) and 2(D)(ii) above, the Authorized Evaluators identified in subparagraph 2(A) shall be permitted to retain one copy of the portions of the ANDA provided and each note, analysis, study or other document prepared by Authorized Evaluators to the extent that they reflect information in the ANDA.

**E.**    **Accidental Disclosure:** Should information from the ANDA be disclosed, inadvertently or otherwise, Recipient shall, at Recipient's earliest opportunity, contact IMPAX and identify:

    **i.**    What has been disclosed;

    **ii.**    The individuals to whom such information has been disclosed; and

    **iii.**    Steps taken by Recipient and Authorized Evaluators to ensure the information in the ANDA continues to be treated pursuant to the terms of this agreement and is not further disseminated.

**3.**    Recipient and Authorized Evaluators recognize that violation of any provision of this Offer of Confidential Access will cause irreparable injury to IMPAX, and that an adequate legal remedy does not exist. IMPAX, therefore, shall have the right, in addition to any other remedies available at law or in equity, to obtain from a court of competent jurisdiction an injunction to prohibit Recipient and Authorized Evaluators from violating the terms of this Offer of Confidential Access. It is further agreed that in such an action IMPAX is entitled to recover any and all damages, costs and expenses, including, but not limited to, all reasonable attorneys' fees, professional fees and court costs.

**4.**    Should any provision set forth in this Offer of Confidential Access be found by a court of competent jurisdiction to be illegal, unconstitutional and/or unenforceable, the remaining provisions shall continue in full force and effect.

**5.**    Nothing contained herein shall be construed as a grant of any license or other right to use the information in the ANDA, except for the purpose expressly stated herein.

**6.**    This Offer of Confidential Access shall be governed by the laws of the State of California, without giving effect to its conflicts of law or choice of law principles.

**7.**    Each of Recipient, Authorized Evaluators and IMPAX, irrevocably submit to and accept, generally and unconditionally, the exclusive personal jurisdiction of the courts of the State of California, and of the U.S. District Court for the Northern District of California, waives its right to assert any objection or defense based on venue or forum non conveniens and agrees to be bound by any judgment rendered thereby arising under or in respect of this Offer of Confidential Access.

8.   When accepted by the parties hereto, this document shall constitute the entire agreement of the parties with respect to the subject matter herein and may not be amended or modified except in writing executed by all of the parties.

9.   An Authorized Evaluator may request access to the ANDA by executing one copy of this Offer of Confidential Access where indicated and returning the executed copy to IMPAX no later than January 4, 2008.  Thereupon, the terms contained in this document shall be considered an enforceable contract between IMPAX and the Recipient.

10.  This Offer of Confidential Access may be executed in two or more counterparts, including by facsimile or scanned PDF copies, each of which shall be deemed an original and all of which shall be deemed one and the same instrument.


IMPAX Laboratories, Inc.

_____
Larry Hsu, President & CEO
Date: December 20, 2007


Recipient
By its authorized agent(s):


Signature: _____

Name (Print): _____

Title: _____

Company: _____

Date: _____, 2007

-4-

**Table of Contents**

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### Washington, DC 20549

# FORM 10-Q

☑ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the quarterly period ended September 30, 2007**

**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from _____ to _____**

**Commission file number 0-18443**

# MEDICIS PHARMACEUTICAL CORPORATION

(Exact name of Registrant as specified in its charter)

| Delaware | 52-1574808 |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

8125 North Hayden Road
Scottsdale, Arizona 85258-2463
(Address of principal executive offices)

(602) 808-8800
(Registrant's telephone number,
including area code)

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. YES ☑ NO ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act. (Check one): Large accelerated filer ☑ Accelerated filer ☐ Non-accelerated filer ☐

Indicate by check mark whether the registrant is a shell company (as defined in Exchange Act Rule 12b-2) YES ☐ NO ☑

Indicate the number of shares outstanding of each of the issuer's classes of common stock, as of the latest practicable date:

| Class | Shares Outstanding at November 5, 2007 |
|---|---|
| Class A Common Stock $.014 Par Value | 56,264,909 |

**Table of Contents**

In addition to the matters discussed above, we and certain of our subsidiaries are parties to other actions and proceedings incident to our business, including litigation regarding our intellectual property, challenges to the enforceability or validity of our intellectual property and claims that our products infringe on the intellectual property rights of others. We record contingent liabilities resulting from claims against us when it is probable (as that word is defined in Statement of Financial Accounting Standards No. 5) that a liability has been incurred and the amount of the loss is reasonably estimable. We disclose material contingent liabilities when there is a reasonable possibility that the ultimate loss will exceed the recorded liability. Estimating probable losses requires analysis of multiple factors, in some cases including judgments about the potential actions of third-party claimants and courts. Therefore, actual losses in any future period are inherently uncertain. In all of the cases noted where we are the defendant, we believe we have meritorious defenses to the claims in these actions and that resolution of these matters will not have a material adverse effect on our business, financial condition, or results of operations; however, the results of the proceedings are uncertain, and there can be no assurance to that effect.

Item 1A. Risk Factors

The risk factors presented below supplement and amend the risk factors previously disclosed by us in Part I, Item 1A of our Annual Report on Form 10-K for the fiscal year ended December 31, 2006.

*Risks Related To Our Business*

*We derive a majority of our sales from our primary products, and any factor adversely affecting sales of these products would harm our business, financial condition and results of operations.*

We believe that the prescription volume of our primary prescription products, in particular, SOLODYN®, and sales of our dermal aesthetic product, RESTYLANE®, will continue to constitute a significant portion of our sales for the foreseeable future. Accordingly, any factor adversely affecting our sales related to these products, individually or collectively, could harm our business, financial condition and results of operations. On June 5, 2006, Allergan announced that the FDA had approved its Juvéderm™ dermal filler family of products. Allergan began marketing these products in January 2007. Other dermal filler products, such as Artefill®, Radiesse® and Elevess™ have also recently been approved by the FDA. Patients may differentiate these products from RESTYLANE® based on price, efficacy and/or duration, which may appeal to some patients. In addition, there are several dermal filler products under development and/or in the FDA pipeline for approval which claim to offer equivalent or greater facial aesthetic benefits to RESTYLANE® and, if approved, the companies producing such products could charge less to doctors for their products. While current patent coverage for SOLODYN® does not expire until 2018, SOLODYN® may face generic competition in the near future without prior notice if a generic competitor decides to enter the market notwithstanding the risk of a suit for patent infringement. Because SOLODYN® contains an antibiotic drug that was first approved by the FDA prior to the enactment of the Food and Drug Administration Modernization Act of 1997, or FDAMA, SOLODYN® does not have the benefit of the protections offered under the Hatch-Waxman Act. Accordingly, we would not receive a Paragraph IV notice regarding SOLODYN® from any potential generic competitor and would not be entitled to an automatic 30-month stay of generic entry that would be available to a patent owner filing an infringement suit based on receipt of such a notice. We currently have one issued patent relating to SOLODYN®. As part of our patent strategy, we are currently pursuing additional patent protection for SOLODYN®. However, we cannot provide any assurance that any additional patents will be issued relating to SOLODYN® and the failure to obtain additional patent protection could adversely affect our ability to deter generic competition, which would adversely affect SOLODYN® revenue and our results of operations. On November 6, 2007, we received notification of a non-final rejection from the U.S. Patent and Trademark Office relating to certain patent applications that we filed relating to SOLODYN®. We intend to respond promptly to the non-final rejections and to continue our vigorous efforts to obtain additional patent protection for SOLODYN®. In addition to SOLODYN®, many of our primary prescription products may be subject to generic competition in the near future. Each of our primary products could be rendered obsolete or uneconomical by competitive changes, including generic competition.

Sales related to our primary prescription products, including SOLODYN®, and sales of RESTYLANE® could also be adversely affected by other factors, including:

Table of Contents

## SIGNATURES

Pursuant to the requirements of the Securities and Exchange Act of 1934, the registrant duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

**MEDICIS PHARMACEUTICAL CORPORATION**

Date: November 9, 2007      By: /s/ Jonah Shacknai
            Jonah Shacknai
            Chairman of the Board and
            Chief Executive Officer
            (Principal Executive Officer)

Date: November 9, 2007      By: /s/ Mark A. Prygocki, Sr.
            Mark A. Prygocki, Sr.
            Executive Vice President
            Chief Financial Officer and Treasurer
            (Principal Financial and Accounting Officer)

46

**Table of Contents**

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

---

# FORM 10-K

☑ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

    **For the year ended December 31, 2007.**

**Or**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

    **For the transition period from _____ to _____.**

**Commission file number 0-18443**

# MEDICIS PHARMACEUTICAL CORPORATION

(Exact name of registrant as specified in its charter)

| | |
|---|---|
| Delaware | 52-1574808 |
| (State of other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| 8125 North Hayden Road, Scottsdale, Arizona | 85258-2463 |
| (Address of principal executive office) | (Zip Code) |

Registrant's telephone number, including area code: (602) 808-8800

Securities registered pursuant to Section 12(b) of the Act: Class A common stock, $0.014 par value

| | |
|---|---|
| New York Stock Exchange | Preference Share Purchase Rights |
| (Name of each exchange on which registered) | (Title of each Class) |

Securities registered pursuant to Section 12(g) of the Act: NONE

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☑ No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☑

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☑ No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of the registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form or any amendment to this Form 10-K ☐.

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a

Table of Contents

Item 1A. Risk Factors

Our statements in this report, other reports that we file with the Securities and Exchange Commission ("SEC"), our press releases and in public statements of our officers and corporate spokespersons contain forward-looking statements within the meaning of Section 27A of the Securities Act of 1933, as amended, Section 21 of the Securities Exchange Act of 1934, as amended, and the Private Securities Litigation Reform Act of 1995. You can identify these statements by the fact that they do not relate strictly to historical or current events, and contain words such as "anticipate," "estimate," "expect," "project," "intend," "will," "plan," "believe," "should," "outlook," "could," "target" and other words of similar meaning in connection with discussion of future operating or financial performance. These include statements relating to future actions, prospective products or product approvals, future performance or results of current and anticipated products, sales efforts, expenses, the outcome of contingencies such as legal proceedings and financial results. These statements are based on certain assumptions made by us based on our experience and perception of historical trends, current conditions, expected future developments and other factors we believe are appropriate in the circumstances. Such statements are subject to a number of assumptions, risks and uncertainties, many of which are beyond our control. These forward-looking statements reflect the current views of senior management with respect to future events and financial performance. No assurances can be given, however, that these activities, events or developments will occur or that such results will be achieved, and actual results may vary materially from those anticipated in any forward-looking statement. Any such forward-looking statements, whether made in this report or elsewhere, should be considered in context of the various disclosures made by us about our businesses including, without limitation, the risk factors discussed below. We do not plan to update any such forward-looking statements and expressly disclaim any duty to update the information contained in this filing except as required by law.

We operate in a rapidly changing environment that involves a number of risks. The following discussion highlights some of these risks and others are discussed elsewhere in this report. These and other risks could materially and adversely affect our business, financial condition, prospects, operating results or cash flows.

*Risks Related To Our Business*

*Certain of our primary products could lose patent protection in the near future and become subject to competition from generic forms of such products. If that were to occur, sales of those products would decline significantly and such decline could have a material adverse effect on our results of operations.*

We depend upon patents to provide us with exclusive marketing rights for certain of our primary products for some period of time. If product patents for our primary products expire, or are successfully challenged by our competitors, in the United States and in other countries, we would face strong competition from lower price generic drugs. Loss of patent protection for any of our primary products would likely lead to a rapid loss of sales for that product, as lower priced generic versions of that drug become available. In the case of products that contribute significantly to our sales, the loss of patent protection could have a material adverse effect on our results of operations. For example, while current patent coverage for SOLODYN® does not expire until 2018, SOLODYN® may face generic competition in the near future without prior notice if a generic competitor decides to enter the market notwithstanding the risk of a suit for patent infringement. Because SOLODYN® contains an antibiotic drug that was first approved by the FDA prior to the enactment of the Food and Drug Administration Modernization Act of 1997, or FDAMA, SOLODYN® does not have the benefit of the protections offered under the Hatch-Waxman Act. Accordingly, we would not receive a Paragraph IV notice regarding SOLODYN® from any potential generic competitor and would not be entitled to an automatic 30-month stay of generic entry that would be available to a patent owner filing an infringement suit based on receipt of such a notice. We currently have one issued patent relating to SOLODYN®. As part of our patent strategy, we are currently pursuing additional patent protection for SOLODYN®. However, we cannot provide any assurance that any additional patents will be issued relating to SOLODYN® and the failure to obtain additional patent protection could adversely affect our ability to deter generic competition, which would adversely affect SOLODYN® revenue and our results of operations. On January 15, 2008, we announced that IMPAX Laboratories, Inc. ("IMPAX") announced that IMPAX sent us a letter advising that IMPAX has filed an ANDA seeking FDA approval to market a generic version of SOLODYN® (minocycline HCl) extended-release capsules. IMPAX has not advised us as to the status of the FDA's review of its filing, or whether IMPAX has complied with recent FDA requirements for proving bioequivalence. Also on January 15, 2008, IMPAX filed a lawsuit against US in the United States District Court for the Northern District of California seeking a declaratory judgment that our U.S. Patent No. 5,908,838 related to SOLODYN® is invalid and is not infringed by IMPAX's ANDA for a generic version of SOLODYN®. In addition to SOLODYN®, many of our primary prescription products may be subject to generic competition in the

15

Table of Contents

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

Date: February 29, 2008

MEDICIS PHARMACEUTICAL CORPORATION

By: /s/ JONAH SHACKNAI
 Jonah Shacknai
 Chairman of the Board and Chief Executive Officer

## POWER OF ATTORNEY

KNOW ALL MEN BY THESE PRESENTS, that each person whose signature appears below constitutes and appoints Jonah Shacknai and Mark A. Prygocki, Sr., or either of them, as his true and lawful attorneys-in-fact and agents, with full power of substitution and resubstitution, for him and in his name, place and stead, in any and all capacities, to sign any and all amendments to this Annual Report on Form 10-K and any documents related to this report and filed pursuant to the Securities Exchange Act of 1934, and to file the same, with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorneys-in-fact and agents, full power and authority to do and perform each and every act and thing requisite and necessary to be done in connection therewith as fully to all intents and purposes as he might or could do in person, hereby ratifying and confirming all that said attorneys-in-fact and agents, or their substitute or substitutes may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the Registrant in the capacities and on the dates indicated.

| SIGNATURE | TITLE | DATE |
| --- | --- | --- |
| /s/ JONAH SHACKNAI<br>Jonah Shacknai | Chairman of the Board of Directors and Chief Executive Officer (Principal Executive Officer) | February 29, 2008 |
| /s/ MARK A. PRYGOCKI, SR.<br>Mark A. Prygocki, Sr. | Executive Vice President, Chief Financial Officer, and Treasurer (Principal Financial and Accounting Officer) | February 29, 2008 |
| /s/ ARTHUR G. ALTSCHUL, JR.<br>Arthur G. Altschul, Jr. | Director | February 29, 2008 |
| /s/ SPENCER DAVIDSON<br>Spencer Davidson | Director | February 29, 2008 |
| /s/ STUART DIAMOND<br>Stuart Diamond | Director | February 29, 2008 |
| /s/ PETER S. KNIGHT, ESQ.<br>Peter S. Knight, Esq. | Director | February 29, 2008 |
| /s/ MICHAEL A. PIETRANGELO<br>Michael A. Pietrangelo | Director | February 29, 2008 |
| /s/ PHILIP S. SCHEIN, M.D.<br>Philip S. Schein, M.D. | Director | February 29, 2008 |
| /s/ LOTTIE SHACKELFORD<br>Lottie Shackelford | Director | February 29, 2008 |

# SOLODYN™
(MINOCYCLINE HCl USP)
EXTENDED RELEASE TABLETS

**Click here for Patient Prescribing Information.**

**Rx Only**
**KEEP OUT OF REACH OF CHILDREN**

To reduce the development of drug-resistant bacteria as well as to maintain the effectiveness of other antibacterial drugs, SOLODYN™ should be used only as indicated.

**SOLODYN™** is indicated to treat only inflammatory lesions of non-nodular moderate to severe acne vulgaris.

This formulation of minocycline has not been evaluated in the treatment of infections.

## DESCRIPTION

Minocycline hydrochloride, a semi synthetic derivative of tetracycline, is [4S-(4α,4aα,5aα,12aα)]-4,7-Bis(dimethylamino)-1,4,4a,5,5a,6,11,12a-octahydro-3,10,12,12a-tetrahydroxy-1,11-dioxo-2-naphthacenecarboxamide mono hydrochloride. The structural formula is represented below:

$C_{23}H_{27}N_3O_7 \cdot HCl$     M. W. 493.95

SOLODYN™ tablets for oral administration contain minocycline hydrochloride USP equivalent to 45 mg, 90 mg or 135 mg of minocycline. In addition, 45 mg, 90 mg, and 135 mg tablets contain the following inactive ingredients: lactose monohydrate NF, hypromellose type 2910 USP, magnesium stearate NF, colloidal silicon dioxide NF, and carnauba wax NF. The 45 mg tablets also contain opadry II gray which contains: lactose monohydrate NF, hypromellose type 2910 USP, titanium dioxide USP, triacetin USP, and iron oxide black JPE. The 90 mg tablets also contain opadry II yellow which contains: hypromellose type 2910 USP, lactose monohydrate NF, titanium dioxide USP, iron oxide yellow NF, polyethylene glycol 3350 NF, and triacetin USP. The 135 mg tablets also contain opadry II pink which contains: hypromellose type 2910 USP, lactose monohydrate NF, titanium dioxide USP, polyethylene glycol 3350 NF, iron oxide red NF, and triacetin USP.

## CLINICAL PHARMACOLOGY

### Pharmacokinetics

SOLODYN™ tablets are not bioequivalent to minocycline products. Based on pharmacokinetic studies in healthy adults, SOLODYN™ tablets produce a delayed $T_{max}$ at 3.5–4.0 hours as compared to a non-modified release reference minocycline product ($T_{max}$ at 2.25–3 hours). At steady-state (Day 6), the mean AUC(0–24) and $C_{max}$ were 33.32 μg×hr/mL and 2.63 μg/mL for SOLODYN™ tablets and 46.35 μg×hr/mL and 2.92 μg/mL for Minocin® capsules, respectively. These parameters are based on dose adjusted to 135 mg per day for both products.

A single-dose, four-way crossover study demonstrated that all strengths of SOLODYN™ tablets (45 mg, 90 mg, 135 mg) exhibited dose-proportional pharmacokinetics.

When SOLODYN™ tablets were administered concomitantly with a meal that included dairy products, the extent and timing of absorption of minocycline did not differ from that of administration under fasting conditions.

### Microbiology

Minocycline is bacteriostatic exerting its antimicrobial effect by the inhibition of bacterial protein synthesis. Minocycline is lipid soluble and distributes in to the skin and sebum. Minocycline has been shown to have *in vitro* activity against *Propionibacterium acnes*, an organism associated with acne vulgaris, however, the clinical significance of this activity against *P. acnes* in patients with acne vulgaris is not known.

### CLINICAL STUDIES

The safety and efficacy of SOLODYN™ in the treatment of inflammatory lesions of non-nodular moderate to severe acne vulgaris was assessed in two 12-week, multi-center, randomized, double-blind, placebo-controlled, studies in subjects ≥ 12 years. The mean age of subjects was 20 years and subjects were from the following racial groups: White (73%), Hispanic (13%), Black (11%), Asian/Pacific Islander (2%), and Other (2%).

In two efficacy and safety trials, a total of 924 subjects with non-nodular moderate to severe acne vulgaris received 1 mg/kg of SOLODYN™ or placebo for a total of 12 weeks. The two primary efficacy endpoints were:

1) Mean percent change in inflammatory lesion counts from Baseline to 12

2) Percentage of subjects with an Evaluator's Global Severity Assessment (EGSA) of clear or almost clear at 12 weeks.

Efficacy results are presented in Table 1.

**Table 1 – Efficacy Results at Week 12**

| | Study 1 | | Study 2 | |
|---|---|---|---|---|
| | SOLODYN™ (1 mg/kg) N = 300 | Placebo N = 151 | SOLODYN™ (1 mg/kg) N = 315 | Placebo N = 158 |
| Mean Percent Improvement in Inflammatory Lesions | 43.1% | 31.7% | 45.8% | 30.8% |
| No. (%) of Subjects Clear or Almost Clear on the EGSA* | 52 (17.3%) | 12 (7.9%) | 50 (15.9%) | 15 (9.5%) |

\* Evaluator's Global Severity Assessment

SOLODYN™ did not demonstrate any effect on non-inflammatory lesions (benefit or worsening).

## INDICATIONS AND USAGE

SOLODYN™ is indicated to treat only inflammatory lesions of non-nodular moderate to severe acne vulgaris in patients 12 years of age and older. SOLODYN™ did not demonstrate any effect on non-inflammatory lesions. Safety of SOLODYN™ has not been established beyond 12 weeks of use.

This formulation of minocycline has not been evaluated in the treatment of infections.

To reduce the development of drug-resistant bacteria as well as to maintain the effectiveness of other antibacterial drugs, SOLODYN™ should be used only as indicated.

## CONTRAINDICATIONS

This drug is contraindicated in persons who have shown hypersensitivity to any of the tetracyclines.

## WARNINGS

### Teratogenic effects

1) MINOCYCLINE, LIKE OTHER TETRACYCLINE-CLASS ANTIBIOTICS, CAN CAUSE FETAL HARM WHEN ADMINISTERED TO A PREGNANT WOMAN. IF ANY TETRACYCLINE IS USED DURING PREGNANCY OR IF THE PATIENT BECOMES PREGNANT WHILE TAKING THESE DRUGS, THE PATIENT SHOULD BE APPRISED OF THE POTENTIAL HAZARD TO THE FETUS.

SOLODYN™ should not be used during pregnancy nor by individuals of either gender who are attempting to conceive a child (see **PRECAUTIONS: Impairment of Fertility & Pregnancy**).

2) THE USE OF DRUGS OF THE TETRACYCLINE CLASS DURING TOOTH DEVELOPMENT (LAST HALF OF PREGNANCY, INFANCY, AND CHILDHOOD UP TO THE AGE OF 8 YEARS) MAY CAUSE PERMANENT DISCOLORATION OF THE TEETH (YELLOW-GRAY-BROWN).

This adverse reaction is more common during long-term use of the drug but has been observed following repeated short-term courses. Enamel hypoplasia has also been reported. TETRACYCLINE DRUGS, THEREFORE, SHOULD NOT BE USED DURING TOOTH DEVELOPMENT.

3) All tetracyclines form a stable calcium complex in any bone-forming tissue. A decrease in fibula growth rate has been observed in premature human infants given oral tetracycline in doses of 25 mg/kg every 6 hours. This reaction was shown to be reversible when the drug was discontinued.

Results of animal studies indicate that tetracyclines cross the placenta, are found in fetal tissues, and can cause retardation of skeletal development on the developing fetus. Evidence of embryotoxicity has been noted in animals treated early in pregnancy (see **PRECAUTIONS: Pregnancy** section).

### Gastro-intestinal effects

**1. Pseudomembranous colitis** has been reported with nearly all antibacterial agents and may range from mild to life-threatening. Therefore, it is important to consider this diagnosis in patients who present with diarrhea subsequent to the administration of antibacterial agents.

Treatment with antibacterial agents alters the normal flora of the colon and may permit overgrowth of clostridia. Studies indicate that a toxin produced by Clostridium difficile is a primary cause of "antibiotic-associated colitis".

After the diagnosis of pseudomembranous colitis has been established, therapeutic measures should be initiated. Mild cases of pseudomembranous colitis usually respond to discontinuation of the drug alone. In moderate to severe cases, consideration should be given to management with fluids and electrolytes, protein supplementation, and treatment with an antibacterial drug clinically effective against Clostridium difficile colitis.

**2. Hepatotoxicity** – Post-marketing cases of serious liver injury, including irreversible drug-induced hepatitis and fulminant hepatic failure (sometimes fatal) have been reported with minocycline use in the treatment of acne.

## Metabolic effects

The tetracyclines may cause an increase in BUN. While this is not a problem in those with normal renal function, in patients with significantly impaired function, higher serum levels of tetracycline-class antibiotics may lead to azotemia, hyperphosphatemia, and acidosis. If renal impairment exists, even usual oral or parenteral doses may lead to excessive systemic accumulations of the drug and possible liver toxicity. Under such conditions, lower than usual total doses are indicated, and if therapy is prolonged, serum level determinations of the drug may be advisable.

## Central nervous system effects

1. Central nervous system side effects including light-headedness, dizziness or vertigo have been reported with minocycline therapy. Patients who experience these symptoms should be cautioned about driving vehicles or using hazardous machinery while on minocycline therapy. These symptoms may disappear during therapy and usually rapidly disappear when the drug is discontinued.

2. Pseudotumor cerebri (benign intracranial hypertension) in adults and adolescents has been associated with the use of tetracyclines. Minocycline has been reported to cause or precipitate pseudotumor cerebri, the hallmark of which is papilledema. Clinical manifestations include headache and blurred vision. Bulging fontanels have been associated with the use of tetracyclines in infants. Although signs and symptoms of pseudotumor cerebri resolve after discontinuation of treatment, the possibility for permanent sequelae such as visual loss that may be permanent or severe exists. Patients should be questioned for visual disturbances prior to initiation of treatment with tetracyclines and should be routinely checked for papilledema while on treatment.

Concomitant use of isotretinoin and minocycline should be avoided because isotretinoin, a systemic retinoid, is also known to cause pseudotumor cerebri.

## Photosensitivity

Photosensitivity manifested by an exaggerated sunburn reaction has been observed in some individuals taking tetracyclines. This has been reported rarely with minocycline. Patients should minimize or avoid exposure to natural or artificial sunlight (tanning beds or UVA/B treatment) while using minocycline. If patients need to be outdoors while using minocycline, they should wear loose-fitting clothes that protect skin from sun exposure and discuss other sun protection measures with their physician.

## PRECAUTIONS

### General

Safety of SOLODYN™ beyond 12 weeks of use has not been established.

As with other antibiotic preparations, use of SOLODYN™ may result in overgrowth of nonsusceptible organisms, including fungi. If superinfection occurs, the antibiotic should be discontinued and appropriate therapy instituted.

Bacterial resistance to the tetracyclines may develop in patients using SOLODYN,™ therefore the susceptibility of bacteria associated with infection should be considered in selecting antimicrobial therapy. Because of the potential for drug-resistant bacteria to develop during the use of SOLODYN,™ it should be used only as indicated.

### Autoimmune Syndromes

Tetracyclines have been associated with the development of autoimmune syndromes. The long-term use of minocycline in the treatment of acne has been associated with drug-induced lupus-like syndrome, autoimmune hepatitis and vasculitis. Sporadic cases of serum sickness have presented shortly after minocycline use. Symptoms may be manifested by fever, rash, arthralgia, and malaise. In symptomatic patients, liver function tests, ANA, CBC, and other appropriate tests should be performed to evaluate the patients. Use of all tetracycline-class drugs should be discontinued immediately.

### Serious Skin/Hypersensitivity Reaction

Post-marketing cases of anaphylaxis and serious skin reactions such as Stevens Johnson syndrome and erythema multiforme have been reported with minocycline use in treatment of acne.

### Tissue Hyperpigmentation

Tetracycline class antibiotics are known to cause hyperpigmentation. Tetracycline therapy may induce hyperpigmentation in many organs, including nails, bone, skin, eyes, thyroid, visceral tissue, oral cavity (teeth, mucosa, alveolar bone), sclerae and heart valves. Skin and oral pigmentation has been reported to occur independently of time or amount of drug administration, whereas other tissue pigmentation has been reported to occur upon prolonged administration. Skin pigmentation includes diffuse pigmentation as well as over sites of scars or injury.

### Information for Patients

(See Patient Package Insert that accompanies this Package Insert for additional information to give patients)

1. Photosensitivity manifested by an exaggerated sunburn reaction has been observed in some individuals taking tetracyclines, including minocycline. Patients should minimize or avoid exposure to natural or artificial sunlight (tanning beds or UVA/B treatment) while using minocycline. If patients need to be outdoors while using minocycline, they should wear loose-fitting clothes that protect skin from sun exposure and discuss other sun protection measures with their physician. Treatment should be discontinued at the first evidence of skin erythema.

---

## Patient Information
### SOLODYN™ (SO-lo-din) Extended Release Tablets
(minocycline HCl, USP)

**Rx only**

Read all patient information that comes with SOLODYN™ before you start taking it and each time you get a refill. There may be new information. This leaflet does not take the place of speaking with your doctor about your condition or treatment.

### What is SOLODYN™?

SOLODYN™ is a tetracycline-class antibiotic medicine that contains minocycline. SOLODYN™ is only for the treatment of pimples and red bumps (non-nodular inflammatory lesions) that happen with moderate to severe acne in patients 12 years and older.

**SOLODYN™ has not been studied for use longer than 12 weeks.**

**SOLODYN™ has not been studied for the treatment of infections.**

### Who should not take SOLODYN™?

**Do not take SOLODYN™ if you are allergic to minocycline or any other tetracycline antibiotics.** Ask your doctor or pharmacist for a list of these medicines if you are not sure. See the end of this leaflet for a complete list of ingredients in SOLODYN.™

**SOLODYN™ should not be used by pregnant women, women attempting to conceive a child, or children up to 8 years old because:**

1. **SOLODYN™ may harm an unborn baby**
2. **SOLODYN™ may permanently turn a baby or child's teeth yellow-grey-brown during tooth development.** SOLODYN™ should not be used during tooth development. Tooth

development happens in the last half of pregnancy and birth to age 8 years.

It is recommended that SOLODYN™ not be used by men who are attempting to father a child.

### What should I tell my doctor before taking SOLODYN™?

**Tell your doctor about all of your medical conditions including if you:**

- **have kidney problems.** Your doctor may prescribe a lower dose of medicine for you.
- **have any vision problems such as blurred vision.**
- **are pregnant or attempting to conceive a child.** SOLODYN™ may harm your unborn baby. **Stop taking SOLODYN™ and call your doctor if you become pregnant while taking it.**
- **are breastfeeding.** SOLODYN™ passes into your milk and may harm your baby. You

should decide whether to use SOLODYN™ or breastfeed, but not both.

**Tell your doctor about all the other medicines you take including prescription and nonprescription medicines, vitamins and herbal supplements.** SOLODYN™ and other medicines may interact. Especially tell your doctor if you take:

- **birth control pills.** SOLODYN™ may make your birth control pills less effective. You should use a second form of birth control while taking SOLODYN.™
- **a blood thinner medicine.** The dose of your blood thinner may be lowered.
- **a penicillin antibiotic medicine.** SOLODYN™ and penicillins should not be used together.
- **antacids that contain aluminum, calcium, or magnesium or iron-containing products.** These can affect how much SOLODYN™ passes into your body.

- **isotretinoin products.**

Know the medicines you take. Keep a list of them to show your doctor and pharmacist.

### How should I take SOLODYN™?

- **SOLODYN™ comes in 3 strengths.** Your doctor will prescribe the strength that is best for your body weight. The usual dose of SOLODYN™ is 1 tablet each day for 12 weeks.
- **Take SOLODYN™ at the same time each day, with or without food.** Taking SOLODYN™ with food may lower your chance of getting irritation or ulcers in your esophagus. Your esophagus is the tube that connects your mouth to your stomach.
- **Swallow SOLODYN™ tablets whole. Do not chew, crush, or split the tablets.**

2. Patients who experience central nervous system symptoms (see **WARNINGS**) should be cautioned about driving vehicles or using hazardous machinery while on minocycline therapy. Patients should also be cautioned about seeking medical help for headaches or blurred vision.

3. Concurrent use of tetracycline may render oral contraceptives less effective (**See Drug Interactions**).

4. Autoimmune syndromes, including drug-induced lupus-like syndrome, autoimmune hepatitis, vasculitis and serum sickness have been observed with tetracycline-class antibiotics, including minocycline. Symptoms may be manifested by arthralgia, fever, rash and malaise. Patients who experience such symptoms should be cautioned to stop the drug immediately and seek medical help.

5. Patients should be counseled about discoloration of skin, scars, teeth or gums that can arise from minocycline therapy.

6. Take SOLODYN™ exactly as directed. Skipping doses or not completing the full course of therapy may decrease the effectiveness of the current treatment course and increase the likelihood that bacteria will develop resistance and will not be treatable by other antibacterial drugs in the future.

7. SOLODYN™ should not be used by pregnant women or women attempting to conceive a child (**See Pregnancy, Carcinogenesis and Mutagenesis sections**).

8. It is recommended that SOLODYN™ not be used by men who are attempting to father a child (**See Impairment of Fertility section**).

**Laboratory Tests**

Periodic laboratory evaluations of organ systems, including hematopoietic, renal and hepatic studies should be performed. Appropriate tests for autoimmune syndromes should be performed as indicated.

**Drug Interactions**

1. Because tetracyclines have been shown to depress plasma prothrombin activity, patients who are on anticoagulant therapy may require downward adjustment of their anticoagulant dosage.

2. Since bacteriostatic drugs may interfere with the bactericidal action of penicillin, it is advisable to avoid giving tetracycline-class drugs in conjunction with penicillin.

3. The concurrent use of tetracycline and methoxyflurane has been reported to result in fatal renal toxicity.

4. Absorption of tetracyclines is impaired by antacids containing aluminum, calcium or magnesium and iron-containing preparations.

5. In a multi-center study to evaluate the effect of SOLODYN™ on low dose oral contraceptives, hormone levels over one menstrual cycle with and without SOLODYN™ 1 mg/kg once-daily were measured.

Based on the results of this trial, minocycline-related changes in estradiol, progestinic hormone, FSH and LH plasma levels, of breakthrough bleeding, or of contraceptive failure, can not be ruled out. To avoid contraceptive failure, female patients are advised to use a second form of contraceptive during treatment with minocycline.

**Drug/Laboratory Test Interactions**

False elevations of urinary catecholamine levels may occur due to interference with the fluorescence test.

**Carcinogenesis, Mutagenesis & Impairment of Fertility**

**Carcinogenesis**—Long-term animal studies have not been performed to evaluate the carcinogenic potential of minocycline. A structurally related compound, oxytetracycline, was found to produce adrenal and pituitary tumors in rats.

**Mutagenesis**—Minocycline was not mutagenic *in vitro* in a bacterial reverse mutation assay (Ames test) or CHO/HGPRT mammalian cell assay in the presence or absence of metabolic activation. Minocycline was not clastogenic *in vitro* using human peripheral blood lymphocytes or *in vivo* in a mouse micronucleus test.

**Impairment of Fertility**—Male and female reproductive performance in rats was unaffected by oral doses of minocycline of up to 300 mg/kg/day (which resulted in up to approximately 40 times the level of systemic exposure to minocycline observed in patients as a result of use of SOLODYN™). However, oral administration of 100 or 300 mg/kg/day of minocycline to male rats (resulting in approximately 15 to 40 times the level of systemic exposure to minocycline observed in patients as a result of use of SOLODYN™) adversely affected spermatogenesis. Effects observed at 300 mg/kg/day included a reduced number of sperm cells per gram of epididymis, an apparent reduction in the percentage of sperm that were motile, and (at 100 and 300 mg/kg/day) increased numbers of morphologically abnormal sperm cells. Morphological abnormalities observed in sperm samples included absent heads, misshapen heads, and abnormal flagella.

Limited human studies suggest that minocycline may have a deleterious effect on spermatogenesis.

SOLODYN™ should not be used by individuals of either gender who are attempting to conceive a child.

**Pregnancy**—Teratogenic Effects: Pregnancy category D (See WARNINGS) All pregnancies have a background risk of birth defects, loss, or other adverse outcome regardless of drug exposure. There are no adequate and well-controlled studies on the use of minocycline in pregnant women. Minocycline, like other

tetracycline-class antibiotics, crosses the placenta and may cause fetal harm when administered to a pregnant woman. Rare spontaneous reports of congenital anomalies including limb reduction have been reported with minocycline use in pregnancy in post-marketing experience. Only limited information is available regarding these reports; therefore, no conclusion on causal association can be established.

Minocycline induced skeletal malformations (bent limb bones) in fetuses when administered to pregnant rats and rabbits in doses of 30 mg/kg/day and 100 mg/kg/day, respectively, (resulting in approximately 3 times and 2 times, respectively, the systemic exposure to minocycline observed in patients as a result of use of SOLODYN™). Reduced mean fetal body weight was observed in studies in which minocycline was administered to pregnant rats at a dose of 10 mg/kg/day (which resulted in approximately the same level of systemic exposure to minocycline as that observed in patients who use SOLODYN™).

SOLODYN™ should not be used during pregnancy. If the patient becomes pregnant while taking this drug, the patient should be apprised of the potential hazard to the fetus and stop treatment immediately.

**Nursing Mothers**

Tetracycline-class antibiotics are excreted in human milk. Because of the potential for serious adverse effects on bone and tooth development in nursing infants from the tetracycline-class antibiotics, a decision should be made whether to discontinue nursing or discontinue the drug, taking into account the importance of the drug to the mother (see WARNINGS).

**Pediatric Use**

SOLODYN™ is indicated to treat only inflammatory lesions of non-nodular moderate to severe acne vulgaris in patients 12 years and older. Safety and effectiveness in pediatric patients below the age of 12 has not been established.

Use of tetracycline-class antibiotics below the age of 8 is not recommended due to the potential for tooth discoloration (see WARNINGS).

**Geriatric Use**

Clinical studies of SOLODYN™ did not include sufficient numbers of subjects aged 65 and over to determine whether they respond differently from younger subjects. Other reported clinical experience has not identified differences in responses between the elderly and younger patients. In general, dose selection for an elderly patient should be cautious, usually starting at the low end of the dosing range, reflecting the greater frequency of decreased hepatic, renal, or cardiac function, and concomitant disease or other drug therapy.

**ADVERSE REACTIONS**

Because clinical trials are conducted under prescribed conditions, adverse reaction rates observed in the clinical trial may not reflect the rates observed in practice. However, adverse reaction information from clinical trials provides a basis for identifying the adverse events that appear to be related to drug use.

Adverse events reported in clinical trials for SOLODYN™ are described below in Table 2.

**Table 2 – Selected Treatment-Emergent Adverse Events in at least 1% of Clinical Trial Subjects**

| Adverse Event | SOLODYN™ (1 mg/kg) N = 674 (%) | PLACEBO N = 364 (%) |
|---|---|---|
| At least one treatment-emergent event | 379 (56) | 197 (54) |
| Headache | 152 (23) | 83 (23) |
| Fatigue | 62 (9) | 24 (7) |
| Dizziness | 59 (9) | 17 (5) |
| Pruritus | 31 (5) | 16 (4) |
| Malaise | 26 (4) | 9 (3) |
| Mood alteration | 17 (3) | 9 (3) |
| Somnolence | 13 (2) | 3 (1) |
| Urticaria | 10 (2) | 1 (0) |
| Tinnitus | 10 (2) | 5 (1) |
| Arthralgia | 9 (1) | 2 (0) |
| Vertigo | 8 (1) | 3 (1) |
| Dry mouth | 7 (1) | 5 (1) |
| Myalgia | 7 (1) | 4 (1) |

Adverse reactions not observed in the clinical trials, but that have been reported with minocycline hydrochloride use in a variety of indications include:

*Skin and hypersensitivity reactions:* fixed drug eruptions, balanitis, erythema multiforme, Stevens-Johnson syndrome, anaphylactoid purpura, photosensitivity, pigmentation of skin and mucous membranes, hypersensitivity reactions, angioneurotic edema, anaphylaxis.

*Autoimmune conditions:* polyarthralgia, pericarditis, exacerbation of systemic lupus, pulmonary infiltrates with eosinophilia, transient lupus-like syndrome.

*Central nervous system:* pseudotumor cerebri, bulging fontanels in infants, decreased hearing.

*Endocrine:* thyroid discoloration, abnormal thyroid function.

*Oncology:* papillary thyroid cancer.

*Gastrointestinal:* enterocolitis, pancreatitis, hepatitis, liver failure.

*Renal:* reversible acute renal failure.

*Hematology:* hemolytic anemia, thrombocytopenia, eosinophilia.

Animal studies suggest that use of minocycline may have deleterious effects on human spermatogenesis (see **Carcinogenesis, Mutagenesis, Impairment of Fertility section**).

**OVERDOSAGE**

In case of overdosage, discontinue medication, treat symptomatically and institute supportive measures. Minocycline is not removed in significant quantities by hemodialysis or peritoneal dialysis.

**DOSAGE AND ADMINISTRATION**

SOLODYN™ is a once-daily tablet to be prescribed based on the patient's weight to achieve approximately a 1 mg/kg dosage without any loading dose. The following table shows tablet strength and body weight to achieve approximately 1 mg/kg.

**Table 3: Dosing Table for SOLODYN™**

| Patient's Weight (lbs.) | Patient's Weight (kg) | Tablet Strength (mg) | Actual mg/kg Dose |
|---|---|---|---|
| 99 – 131 | 45 – 59 | 45 | 1 – 0.76 |
| 132 – 199 | 60 – 90 | 90 | 1.5 – 1 |
| 200 – 300 | 91 – 136 | 135 | 1.48 – 0.99 |

SOLODYN™ tablets may be taken with or without food (see **CLINICAL PHARMACOLOGY**). Ingestion of food along with SOLODYN™ may help reduce the risk of esophageal irritation and ulceration.

The recommended dosage of SOLODYN™ per clinical trials is 1 mg/kg daily for 12 weeks. Higher doses have not shown to be of additional benefit in the treatment of inflammatory lesions of acne, and may be associated with more acute vestibular side effects.

In patients with renal impairment (see **WARNINGS**), the total dosage should be decreased by either reducing the recommended individual doses and/or by extending the time intervals between doses.

**HOW SUPPLIED**

SOLODYN™ (MINOCYCLINE HCl, USP) Extended Release Tablets are supplied as aqueous film coated tablets containing minocycline hydrochloride equivalent to 45 mg, 90 mg or 135 mg minocycline.

The 45 mg extended release tablets are gray, unscored, coated, and debossed with "DYN-045" on one side. Each tablet contains minocycline hydrochloride equivalent to 45 mg minocycline, supplied as follows:

NDC 99207-460-30    Bottle of 30
NDC 99207-460-90    Bottle of 90
NDC 99207-460-10    Bottle of 100

The 90 mg extended release tablets are yellow, unscored, coated, and debossed with "DYN-090" on one side. Each tablet contains minocycline hydrochloride equivalent to 90 mg minocycline, supplied as follows:

NDC 99207-461-30    Bottle of 30
NDC 99207-461-90    Bottle of 90
NDC 99207-461-10    Bottle of 100

The 135 mg extended release tablets are pink (orange-brown), unscored, coated, and debossed with "DYN-135" on one side. Each tablet contains minocycline hydrochloride equivalent to 135 mg minocycline, supplied as follows:

NDC 99207-462-30    Bottle of 30
NDC 99207-462-90    Bottle of 90
NDC 99207-462-10    Bottle of 100

Store at 25°C (77°F); excursions are permitted to 15°-30°C (59°-86°F) [See USP Controlled Room Temperature].

Protect from light, moisture, and excessive heat.
Dispense in tight, light-resistant container with child-resistant closure.

U.S. Patent 5,908,838 and Patent Pending

Manufactured for:
**Medicis, The Dermatology Company**
Scottsdale, AZ 85258

Manufactured by:
**AAIPharma, Inc.**
Wilmington, NC 28405

46010-08B      122006

---

• **If you forget to take SOLODYN™,** take it as soon as you remember. Do not take more than one tablet of SOLODYN™ in one day.

• **If you take too much SOLODYN™ at a time,** call your doctor.

• **If you do not notice an improvement in your acne after 12 weeks of treatment with SOLODYN™,** call your doctor.

**What are the possible side effects of SOLODYN™?**
SOLODYN™ may cause serious side effects. Stop SOLODYN™ and call your doctor if you have:

• watery diarrhea
• bloody stools
• stomach cramps
• unusual headaches
• blurred vision
• fever

• rash
• joint pain
• feeling very tired

**SOLODYN™ may also cause:**

• **central nervous system effects.** Symptoms include light-headedness, dizziness, and a spinning feeling (vertigo). You should not drive or operate dangerous machines if you have these symptoms.

• **sun sensitivity (photosensitivity).** You may get a worse sunburn with SOLODYN™. Avoid sun exposure and the use of sunlamps or tanning beds. Protect your skin while out in sunlight. Stop SOLODYN™ and call your doctor at the first sign of redness or sunburn.

• darkening of skin, scars, teeth, and gums.

**The most common side effects with SOLODYN™ include:**

• headache
• nausea
• tiredness
• dizziness or spinning feeling
• diarrhea
• stomach area pain
• itching

Call your doctor if you have a side effect that bothers you or that does not go away.

These are not all the side effects with SOLODYN™. Ask your doctor or pharmacist for more information.

**How should I store SOLODYN™?**

• Store SOLODYN™ at room temperature. Keep SOLODYN™ tablets in the bottle you received from the pharmacy and store away from moisture and light.
• **Keep SOLODYN™ and all medicines out of the reach of children.**

**General Information about SOLODYN™**
Medicines are sometimes prescribed for conditions that are not mentioned in patient information leaflets. Do not use SOLODYN™ for a condition for which it was not prescribed. Do not give SOLODYN™ to other people, even if they have the same symptoms you have. It may harm them.

This leaflet summarizes the most important information about SOLODYN™. If you would like more information, talk to your doctor. You can ask your doctor or pharmacist for information about SOLODYN™ that is written for health professionals.

**What are the ingredients in SOLODYN™?**
**Active Ingredient:** minocycline HCl USP equivalent to 45 mg, 90 mg or 135 mg of minocycline.

**Inactive Ingredients:** lactose monohydrate NF, hypromellose type 2910 USP, magnesium

stearate NF, colloidal silicon dioxide NF, and carnauba wax NF. The 45 mg tablets also contain opadry II gray which contains: lactose monohydrate NF, hypromellose type 2910 USP, titanium dioxide USP, triacetin USP, and iron oxide black JPE. The 90 mg tablets also contain opadry II which contains: hypromellose type 2910 USP, lactose monohydrate NF, titanium dioxide USP, iron oxide yellow NF, polyethylene glycol 3350 NF, and triacetin USP. The 135 mg tablets also contain opadry II pink which contains: hypromellose type 2910 USP, lactose monohydrate NF, titanium dioxide USP, polyethylene glycol 3350 NF, iron oxide red NF, and triacetin USP.

SOLODYN™ is manufactured by AAIPharma, Inc. for Medicis Pharmaceutical Corporation, Scottsdale, Arizona, 85258.

**August 2006**

46010-08B

# Medicis Reports First Quarter 2007 Financial Results

SCOTTSDALE, Ariz., May 8, 2007 (PRIME NEWSWIRE) -- Medicis (NYSE:MRX) today announced revenue for the three months ended March 31, 2007 of approximately $95.1 million, compared to approximately $75.2 million for the three months ended March 31, 2006. Net income computed in accordance with U.S. generally accepted accounting principles (GAAP) for the three months ended March 31, 2007 was approximately $9.3 million, or approximately $0.15 per diluted share, compared to GAAP net loss of approximately $88.5 million, or approximately $1.63 per diluted share for the three months ended March 31, 2006. This compares to the Company's published guidance of approximately $95 million in revenue and approximately $0.12 in earnings per diluted share for the three months ended March 31, 2007. Diluted per share amounts are calculated using the "if-converted" method of accounting in accordance with GAAP.

Non-GAAP earnings per diluted share for the three months ended March 31, 2007, adjusted only for FAS 123R share-based compensation expense, was approximately $0.20 per diluted share. This compares to the Company's published guidance of approximately $0.18 in non-GAAP earnings per diluted share for the three months ended March 31, 2007. FAS 123R share-based compensation expense was approximately $5.5 million for the three months ended March 31, 2007, or approximately $3.6 million after taxes, and approximately $0.05 per diluted share.

"We are pleased to begin the year with a strong first quarter," said Jonah Shacknai, Chairman and Chief Executive Officer of Medicis. "In mid-January, we launched ZIANA(TM) to physicians. The early results from this first ever combination clindamycin and tretinoin acne treatment have been very encouraging. We are delighted by the U.S. Food and Drug Administration's (FDA) approval of PERLANE(R) and look forward to the impact it will have on the aesthetic franchise's performance in future quarters. As always, we are focused on vigorously protecting our primary brands with even stronger intellectual property rights. We continue final development of RELOXIN(R) with the goal of filing with the FDA before the year's end."

Medicis provides non-GAAP financial information which has been adjusted for share-based compensation. Balances adjusted for share-based compensation are referred to as "non-GAAP." Further discussion of the non-GAAP financial information, as well as a reconciliation of the non-GAAP financial results and Medicis' GAAP financial results can be found below.

For the three months ended March 31, 2007, revenue increased approximately $20.0 million to approximately $95.1 million, compared to approximately $75.2 million for the three months ended March 31, 2006. The approximately 27% year over year increase in revenue for the three months ended March 31, 2007 was primarily due to the successful launches of SOLODYN(R) and ZIANA(TM).

## Acne Products

Medicis recorded revenue of approximately $45.9 million associated with its acne products in the three months ended March 31, 2007. The approximately $31.9 million increase in acne product revenue, an increase of approximately 228% from the three months ended March 31, 2006, is primarily due to the prescriptions associated with SOLODYN(R) and ZIANA(TM) in the first quarter of 2007, partially offset by decreases in sales of DYNACIN(R), PLEXION(R) and TRIAZ(R) products due to competitive pressures, including generic competition. Medicis' acne products include primarily DYNACIN(R), PLEXION(R), SOLODYN(R), TRIAZ(R) and ZIANA(TM).

## Non-Acne Products

Medicis recorded revenue of approximately $40.6 million associated with its non-acne products in the three months ended March 31, 2007. This represents an approximately $9.9 million decrease compared to the three months ended March 31, 2006 and an approximately $14.6 million increase sequentially from the quarter ended December 31, 2006. The LOPROX(R), RESTYLANE(R) and VANOS(TM) brands achieved the Company's internal expectations in the face of competitive pressure. Medicis' non-acne products include primarily LOPROX (R), RESTYLANE(R) and VANOS(TM).

Other Non-Dermatological Products

Medicis recorded revenue of approximately $8.5 million associated with its other non-dermatological products during the three months ended March 31, 2007. Medicis' other non-dermatological products include primarily AMMONUL(R), BUPHENYL(R) and contract revenue.

Other Income Statement Items

Gross profit margins for the three months ended March 31, 2007 increased approximately 5.2 percentage points to approximately 89.0%, compared to approximately 83.8% for the three months ended March 31, 2006. The increase in gross profit margins was primarily attributable to the change in product mix towards the higher gross profit margin products such as SOLODYN(R).

GAAP selling, general and administrative (SG&A) expenses for the three months ended March 31, 2007 were approximately $62.3 million, or approximately 65.5% of net revenues, compared to approximately $51.2 million, or approximately 68.2% of net revenues, for the three months ended March 31, 2006. The increase in SG&A as compared to the same period last year was primarily due to personnel costs associated with the aesthetic sales force expansion and annual salary increases, promotional programs for RESTYLANE(R), promotional spending behind the launches of SOLODYN(R) and ZIANA(TM), and costs related to the development and implementation of our new ERP system. Approximately $5.4 million was recorded in SG&A related to FAS 123R share-based compensation expense for the three months ended March 31, 2007.

GAAP research and development (R&D) expenses for the three months ended March 31, 2007 were approximately $8.0 million, or approximately 8.4% of net revenues, compared to approximately $97.2 million, or approximately 129.4% of net revenues, for the same period last year. For the three months ended March 31, 2006, R&D expenses included an approximately $90.5 million special charge associated with the RELOXIN(R) transaction. R&D expenses for the three months ended March 31, 2007 consisted primarily of ongoing expenses related to RELOXIN(R). Approximately $0.1 million was recorded in R&D related to FAS 123R share-based compensation expense for the three months ended March 31, 2007.

SOLODYN(R) Intellectual Property

Medicis continues to enhance the intellectual property associated with its SOLODYN(R) brand. To date, the Company has identified at least one issued patent having one or more claims that cover our SOLODYN(R) tablets (U.S. Patent No. 5,908,838). We have been actively pursuing additional patent applications directed to our SOLODYN(R) products. Over the last two years, eight patent applications (two international filings and six U.S. filings) have been filed. One of our U.S. filings is publicly available at http://portal.uspto.gov/external/portal/pair (application number 11/166,817), and one of our international filings is publicly available at http://www.wipo.int/pctdb/en/search-adv.jsp (publication number WO/2007/001961).

2007 Guidance Update

Based upon information available currently to the Company, the Company's financial guidance is as follows:

```
                        Calendar 2007
              (in millions, except per share amounts)

                First    Second    Third    Fourth   Calendar
               Quarter   Quarter   Quarter  Quarter  Year End
              (3/31/07) (6/30/07) (9/30/07)(12/31/07)  2007
               Actual   Estimated Estimated Estimated Estimated
              --------- --------- --------- --------- ---------

Revenue           $   95  $   107  $   120   $   130   $   452
```

```
Non-GAAP diluted
 earnings per
 share objectives (a)  $  0.20  $  0.30  $  0.38  $  0.48  $  1.36


FAS 123R
 share-based
 compensation
 expense               ($ 0.05) ($ 0.05) ($ 0.05) ($ 0.05) ($ 0.20)
                       -------  -------  -------  -------  -------

GAAP diluted
 earnings per
 share objectives      $  0.15  $  0.25  $  0.33  $  0.43  $  1.16
                       =======  =======  =======  =======  =======
```

(a) Excludes special charges associated with FAS 123R share-based
    compensation expense and R&D development milestone or contract
    payments

The earnings per share estimates above include amortization associated with the approximately $29.1 million payment due to Q-Med as a result of the FDA approval of PERLANE(R) in May 2007, estimated R&D expenses associated with the RELOXIN(R) project, anticipated promotional spending for RESTYLANE(R), estimated launch costs associated with ZIANA(TM) and PERLANE(R), and the anticipated costs associated with the aesthetics sales force expansion.

At the time of this disclosure, Medicis believes these objectives are attainable based upon information currently available to the Company.

"If-Converted" Net Income and Diluted Earnings Per Share

"If-converted" net income and diluted earnings per share amounts are calculated using the "if-converted" method of accounting in accordance with GAAP regardless of whether the outstanding Old Notes and New Notes meet the criteria for conversion and regardless of whether the bondholders actually convert their bonds into shares.

Use of Non-GAAP Financial Information

To the extent that the Company has provided non-GAAP financial information in this press release, it has done so in order to provide meaningful supplemental information regarding its operational performance and to enhance its investors' overall understanding of its core financial performance. Management measures the Company's performance using non-GAAP financial measures such as those that are disclosed in this press release. This information facilitates management's internal comparisons to the Company's historical core operating results, comparisons to competitors' core operating results and is a basis for financial decision making. Management believes that Medicis' investors benefit from seeing the Company's results on the same basis as management, in addition to the GAAP presentation. In our view, the non-GAAP adjustments are informative to investors, allowing them to focus on the ongoing operations and the core results of Medicis' business. Historically, Medicis has reported similar non-GAAP information to its investors and believes that the inclusion of comparative numbers provides consistency in the Company's financial disclosures. This information is not in accordance with, or an alternative for, information prepared using GAAP in the United States. It excludes items, such as special charges for R&D, FAS 123R share-based compensation expense, the impairment of long-lived assets, and litigation reserves that may have a material effect on the Company's net income and diluted net income per common share calculated in accordance with GAAP. The Company excludes such charges and the related tax benefits when analyzing its financial results as the items are distinguishable events and have no impact to the Company's ongoing results of operations. Management believes that by viewing the Company's results of operations excluding these charges, investors are given an indication of the ongoing results of the Company's operations.

About Medicis

Medicis is the leading independent specialty pharmaceutical company in the United States focusing primarily on the treatment of dermatological and aesthetic conditions. The Company is dedicated to helping patients attain a healthy and youthful appearance and self-image. Medicis has leading branded prescription products in a number of therapeutic and aesthetic categories. The Company's products have earned wide acceptance by both physicians and patients due to their clinical effectiveness, high quality and cosmetic elegance.

The Company's products include the prescription brands RESTYLANE(R) (hyaluronic acid), PERLANE(R) (hyaluronic acid), DYNACIN(R) (minocycline HCl), LOPROX(R) (ciclopirox), OMNICEF(R) (cefdinir), PLEXION(R) (sodium sulfacetamide/sulfur), SOLODYN(R) (minocycline HCl, USP) Extended Release Tablets, TRIAZ(R) (benzoyl peroxide), LIDEX(R) (fluocinonide) Cream, 0.05%, VANOS(TM) (fluocinonide) Cream, 0.1%, SYNALAR (R) (fluocinolone acetonide), and ZIANA(TM) (clindamycin phosphate 1.2% and tretinoin 0.025%) Gel, BUPHENYL(R) (sodium phenylbutyrate) and AMMONUL(R) (sodium phenylacetate/sodium benzoate), prescription products indicated in the treatment of Urea Cycle Disorder, and the over-the-counter brand ESOTERICA(R). For more information about Medicis, please visit the Company's website at www.medicis.com.

Forward-Looking Statements

This press release contains "forward-looking statements" within the meaning of the Securities Litigation Reform Act. All statements included in this press release that address activities, events or developments that Medicis expects, believes or anticipates will or may occur in the future are forward-looking statements, including:

```
 -- Medicis' future prospects;
 -- revenue, expense, tax rate and earnings guidance;
 -- information regarding business development activities and future
    regulatory approval of the Company's products;
 -- the successful launches and growth of PERLANE(R), SOLODYN(R) and
    ZIANA(TM);
 -- the patentability of certain intellectual property;
 -- the future expansion of the aesthetics market; and
 -- expectations relating to the Company's product development pipeline.
```

These statements are based on certain assumptions made by Medicis based on its experience and perception of historical trends, current conditions, expected future developments and other factors it believes are appropriate in the circumstances. No assurances can be given, however, that these activities, events or developments will occur or that such results will be achieved. Such statements are subject to a number of assumptions, risks and uncertainties, many of which are beyond the control of Medicis. The Company's business is subject to all risk factors outlined in the Company's most recent annual report on Form 10-K for the year ended December 31, 2006, and other documents we file with the Securities and Exchange Commission. At the time of this press release, the Company cannot, among other things, assess the likelihood, timing or forthcoming results of R&D projects, the risks associated with the FDA approval process and risks associated with significant competition within the Company's industry, nor can the Company validate its assumptions of the full impact on its business of the approval of competitive generic versions of the Company's primary brands, and any future competitive product approvals that may affect the Company's brands, including the RESTYLANE(R) franchise.

Additionally, Medicis may acquire and/or license products or technologies from third parties to enter into new strategic markets. The Company periodically makes up-front, non-refundable payments to third parties for R&D work that has been completed and periodically makes additional non-refundable payments for the achievement of various milestones. There can be no certainty about the periods in which these potential payments could be made, nor if any payments such as these will be made at all. Any estimated future guidance does not include, among other things, the potential payments associated with any such transactions.

There are a number of additional important factors that could cause actual results to differ materially from those projected, including:

```
-- the anticipated size of the markets and demand for Medicis' products;
-- the availability of product supply or changes in the costs of raw
   materials;
-- the receipt of required regulatory approvals;
-- product liability claims;
-- the introduction of federal and/or state regulations relating to the
   Company's business;
-- dependence on sales of key products;
-- changes in the treatment practices of physicians that currently
   prescribe the Medicis' products;
-- the uncertainty of future financial results and fluctuations in
   operating results;
-- dependence on Medicis' strategy (including the uncertainty of license
   payments and/or other payments due from third parties);
-- changes in reimbursement policies of health plans and other health
   insurers;
-- the timing and success of new product development by Medicis or third
   parties;
-- the inability to secure patent protection from filed patent
   applications, inadequate protection of Medicis' intellectual property
   or challenges to the validity or enforceability of the Medicis'
   proprietary rights;
-- the risk of competitive product introductions, including the
   introduction of generic and branded competitive products;
-- the risks of pending and future litigation or government
   investigations; and
-- other risks described from time to time in Medicis' filings with the
   Securities and Exchange Commission.
```

Forward-looking statements represent the judgment of Medicis' management as of the date of this release and Medicis disclaims any intent or obligation to update any forward-looking statements contained herein, which speak as of the date hereof.

NOTE: Full prescribing information for any of Medicis' prescription product is available by contacting the Company. OMNICEF(R) is a trademark of Fujisawa Pharmaceutical Co. Ltd. and is used under a license from Abbott Laboratories, Inc. On April 1, 2005, Fujisawa Pharmaceutical Co. Ltd. merged with Yamanouchi Pharmaceutical Co. Ltd., creating Astelles Pharma, Inc. RESTYLANE(R) and PERLANE(R) are registered trademarks of HA North American Sales AB, a subsidiary of Medicis Pharmaceutical Corporation. All other marks (or brands) and names are the property of Medicis or its Affiliates.

```
                              Medicis
                   Summary Statements of Operations
                   --------------------------------
                   (in thousands, except per share data)
                              (unaudited)
```

|  | Three months ended March 31, | |
|---|---|---|
|  | 2007 | 2006 |
| Product revenues | $ 92,371 | $ 71,087 |
| Contract revenues | 2,743 | 4,071 |
| Total revenues | 95,114 | 75,158 |
| Cost of revenues | 10,497 | 12,179 |
| Gross profit | 84,617 | 62,979 |

```
Operating expenses:
  Selling, general and administrative           62,260      51,223(a)
  Research and development                        8,006      97,218(b)
  Depreciation and amortization                   5,455       5,856
                                               ---------   ---------
    Total operating expenses                     75,721     154,297
                                               ---------   ---------

Operating income (loss)                           8,896     (91,318)

Interest income, net                             (6,349)     (4,362)

Income tax expense                                5,957       1,587
                                               ---------   ---------
Net income (loss)                              $  9,288    $ (88,543)
                                               =========   =========

Basic net income (loss) per common share       $   0.17    $   (1.63)

Diluted net income (loss) per common share      $   0.15    $   (1.63)

Shares used in basic net income (loss)
 per common share                                55,626      54,356

Shares used in diluted net income (loss)
 per common share                                71,720      54,356

Cash flow from (used in) operations            $ 25,754    $(111,521)
```

(a) Selling, general and administrative expense for the three
    months ended March 31, 2006 includes $6.6 million of compensation
    expense related to stock options and restricted stock, $6.0
    million related to a loss contingency for a legal matter, $1.8
    million related to a settlement of a dispute related to the
    Company's merger with Ascent, and $0.5 million related to the
    Company's development and distribution agreement with Ipsen for
    the development of RELOXIN(R).
(b) Research and development expense for the three months ended
    March 31, 2006 includes $90.5 million related to the Company's
    development and distribution agreement with Ipsen for the
    development of RELOXIN(R) and $0.5 million of compensation
    expense related to stock options and restricted stock.

```
                                                Three months ended
                                                  March 31, 2007
                                               -------------------------
                                               Dollar Value   EPS Impact
                                               ------------   ----------
GAAP net income and basic EPS                  $    9,288       $0.17
                                               ========       =====
Interest expense and associated bond
 offering costs (tax-effected)                 $    1,674(a)
                                               --------       -----

GAAP "if-converted" net income and
 diluted EPS                                   $   10,962       $0.15
```

Non-GAAP adjustments:

  FAS 123R share-based compensation expense:

```
       Selling, general and administrative      5,377        0.08
       Research and development                   138        0.00


  Income tax effects                          (1,870)      (0.03)

                                             --------      -----
Non-GAAP "if-converted" net income
 and diluted EPS                            $ 14,607       $0.20
                                             ========      =====

                                                           2007
                                                           ------
Shares used in basic net income per common share          55,626

Shares used in diluted net income per common share        71,720
```

(a) In order to determine "if-converted" net income, the
    tax-effected net interest on the 2.5% and 1.5% contingent
    convertible notes and the associated bond offering costs of $1.7
    million are added back to GAAP net income for the three months
    ended March 31, 2007.


The following table represents a reconciliation of GAAP selling,
general and administrative expenses to non-GAAP selling, general and
administrative expenses. All numbers are shown in thousands and are
not tax-effected.

|  | Three Months Ended March 31, | |
| --- | --- | --- |
|  | 2007 | 2006 |
| GAAP selling, general and administrative | $ 62,260 | $ 51,223 |
| FAS 123R share-based compensation expense | (5,377) | (6,647) |
| Contingency related to a legal matter | -- | (6,000) |
| Settlement of dispute related to Ascent merger | -- | (1,833) |
| Professional fees related to development agreement with Ipsen | -- | (477) |
| Non-GAAP selling, general and administrative expenses | $ 56,883 | $ 36,266 |


The following table represents a reconciliation of GAAP research and
development expenses to non-GAAP research and development expenses.
All numbers are shown in thousands and are not tax-effected.

|  | Three Months Ended March 31, | |
| --- | --- | --- |
|  | 2007 | 2006 |
| GAAP research and development expenses | $ 8,006 | $ 97,218 |
| Milestone and development costs related to development agreement with Ipsen for the development of RELOXIN(R) | -- | (90,473) |
| FAS 123R share-based compensation expense | (138) | (534) |
| Non-GAAP research and development expenses | $ 7,868 | $ 6,211 |

```
                    Medicis Pharmaceutical Corporation
                              Balance Sheets

                                        March 31,    December 31,
                                           2007          2006
                                        ----------    ----------
Assets
Cash, cash equivalents & short-term
 investments                            $  644,464    $  554,261
Accounts receivable, net                    17,997        36,370
Inventory, net                              30,842        27,016
Other current assets                        43,707        39,037
                                        ----------    ----------
Total current assets                       737,010       656,684
Property & equipment, net                    7,467         6,576
Intangible assets, net                     227,888       232,314
Deferred tax asset                          36,474        41,241
Long-term investments                       73,558       130,290
Other assets                                 1,645         2,181
                                        ----------    ----------
Total assets                            $1,084,042    $1,069,286
                                        ==========    ==========

Liabilities and stockholders' equity
Current liabilities                     $   97,852    $  106,662
Contingent convertible senior notes 2.5%,
 due 2032                                  169,150       169,155
Contingent convertible senior notes 1.5%,
 due 2033                                  283,910       283,910
Stockholders' equity                       533,130       509,559
                                        ----------    ----------
Total liabilities and stockholders' equity $1,084,042  $1,069,286
                                        ==========    ==========
Working capital                         $  639,158    $  550,022
                                        ==========    ==========


CONTACT:  Medicis
          Kara Stancell
          (602) 808-3854
```

## Thomson StreetEvents℠

### MRX - Q4 2006 Medicis Earnings Conference Call

Event Date/Time: Feb. 28. 2007 / 5:15PM ET


© 2007 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

**Feb. 28. 2007 / 5:15PM, MRX - Q4 2006 Medicis Earnings Conference Call**

about being a leader in this category and we're excited about ZIANA really finding its own watermark the way that SOLODYN has already and we hope to even more in the future.

**Corey Davis** - *Natexis Bleichroeder, Inc. - Analyst*

Okay. And lastly, on SOLODYN, now that it's so big, it's certainly going to attract some attention. You just remind us how good you feel about the IP, I think there's one issued patent and anything else planned to protect it? Because obviously those patents aren't in the orange books. You won't have the luxury of a 30-month stay.

**Jonah Shacknai** - *Medicis Pharmaceutical Corp. - CEO*

But we feel very good about it, Corey. We have had one patent issue that we think is protective. We have several more that are pending before the patent and trademark office that we think are very, very strong and protective. And we have even more because new data have emerged around the product. So we expect a continuous flow of appropriate applications to the patent and trademark office. It wouldn't surprise me at the end of the day if we have half a dozen or more patents that cover SOLODYN. These patents will be published.

Obviously on their publication by the patent and trademark office, that publication will put other companies, certainly generic competitors, potentially, on notice of the strength of those patents. If they willfully infringe them there are very significant damages, treble damages. We're going to be very vigorous I think in enforcing the patents or even the suggestion that someone is going to infringe our patents. We've employed several different law firms, not only to review what we have, but also to plan what we will have. And we have hired a couple of firms that I think are vicious in their enforcement and protection of patents, because we want to send a very strong message that this needs to be an impenetrable defense around this brand.

**Corey Davis** - *Natexis Bleichroeder, Inc. - Analyst*

Great. Thanks, Jonah.

**Operator**

Your next question comes from Adam Greene from JPMorgan.

**Adam Greene** - *JPMorgan - Analyst*

Thanks. A few quick questions. Could you just remind us where you are -- the salesforce size and what the order of product positioning is within those salesforces? And also, if you could talk about any initiatives to reinvigorate VANOS sales. Are you changing the marketing message at all? Is the decline in scripts more a function of a lack of attention last year? Or is it other factors there?

**Jonah Shacknai** - *Medicis Pharmaceutical Corp. - CEO*

Sure. In aesthetics, by the end of this month, we'll have about 90 sales representatives. And we have 100 on the therapeutic or medical dermatology side of our business. We're not going to comment on any potential growth in either of those sales forces, but obviously that's always a possibility based on factors in the market, new products, those kinds of things.

Right now, the medical salesforce is promoting SOLODYN and ZIANA, with essentially equal attention. It's a little bit variable by region, but on a national basis, that statement is certainly accurate. VANOS comes next among 50 of the 100 sales representatives.

© 2007 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

## Thomson StreetEvents℠

### MRX - Medicis at Deutsche Bank 32nd Annual Health Care Conference

Event Date/Time: May. 03. 2007 / 9:00AM ET

© 2007 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

May. 03. 2007 / 9:00AM, MRX - Medicis at Deutsche Bank 32nd Annual Health Care Conference

appropriate focus and concentration of our efforts. Nevertheless, we are definitely not saying goodbye to VANOS as we have to some other products over the years, as more compelling things have come into our mix. And we expect that product to be doing better as we move ahead as well, again, with some alternative promotional techniques.

We obviously are also very focused on research and development. This is a very, very important and big year for us. It is our expectation, as we stand here, to submit the Reloxin application this year. But obviously based on the Perlane experience, I think we're all a little reticent about predicting exactly when something is going to be approved.

I hope though that as we get closer, we'll be able to give out a bit more information and give greater clarity to the public markets on when Reloxin will be approved. The clinical data around Reloxin have been extremely strong. We have not made any public discourse within the securities markets, but certainly in the academic community, data have been presented about Reloxin, both as a single entity and in comparison with other neurotoxins.

And, I think we are extremely heartened by the data that we have aggregated in terms of efficacy, in terms of onset of action, in terms of persistence. And some of the competitive data that we've been able to adduce or those independently have adduced have also been extremely encouraging.

So our expectation is that we are going to hit the ground running and strong in the neurotoxin market. I would tell that unlike some other companies, we are not by nature price competitors. So it is not our view that we're going to become the Wal-Mart of the neurotoxin market, but rather a company that's proud of its products.

That will sell them at a price that's appropriate to the market and we're really focused on the advantages, the features and benefits of the product rather than on trying to get people to overcome their better judgment with the bottom-level discounting. So I think that none of you should expect that we're going to behave like drunken sailors when Reloxin is approved.

We know what our profit margins in the product are, we know what they need to be and again it's not our nature to suspend good judgment and just try to grab market share at any cost, even at the cost of profitability. So I think you can take some solace from the fact that we will not be among the companies initiating a price war in a category that really should maintain its price structure admirably.

This is a category, as we appreciate, that's completely discretionary with consumers and there's absolutely no reason on earth to get into a price war that in some respects mirrors what the generic markets have become which is, north of the equator, a downward spiral in clockwise fashion. And we are not going to be participants in that with Restylane, we're not going to participants with Reloxin.

We also know this year that we expect to hear from the US Patent & Trademark Office on the many, many applications that we have filed for SOLODYN. One patent has been issued, others are pending, and I would argue are in the late stage of consideration by the Patent & Trademark Office and yet others have been filed relatively recently.

So we think that there are literally dozens and dozens of claims around SOLODYN. We have received the view of several independent law firms working apart from one another and then talking together at the end that our position with SOLODYN is an extremely strong one, and that's what we believe.

So despite the fact that there are lots of rumors, and maybe they're true, that generic companies have eyed this market because of the great success of SOLODYN and have either prepared to or actually filed applications. We intend to enforce with the ultimate vigor the patents that have issued, those that we expect to issue and those that we hope will issue over the course of this year.

So we're very, very excited about that because we've invested a lot of money in developing SOLODYN, we've put a lot of effort into creating into the juggernaut that it has become in the market. And I think the recent days have shown us even more that

© 2007 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

## Thomson StreetEvents℠

### MRX - Medicis at Morgan Stanley Global Healthcare Unplugged Conference

Event Date/Time: May. 04. 2007 / 11:45AM ET


© 2007 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

**May. 04. 2007 / 11:45AM, MRX - Medicis at Morgan Stanley Global Healthcare Unplugged Conference**

**Unidentified Audience Member**

[inaudible - microphone inaccessible] does the immediate solution do some couponing to help patients with copays?

**Jonah Shacknai** - *Medicis - CEO*

Well, we were actually, as far as I know, the first dermatology company and maybe the first pharmaceutical company in the United States to introduce a coupon or rebate to help patients with their copayment. This goes back to 1993, so we have a little bit of experience with this. We have used a number of means, including a call center, to help patients and pharmacists to overcome copayments that seem staggering.

But certainly we have some other kinds of programs in mind that we think will be very simple for patients, easy to understand for physicians and will be helpful in addressing the problem.

**Unidentified Audience Member**

Which products is Solodyn taking market share?

**Unidentified Speaker**

I think the question was which products is Solodyn taking market share from.

**Jonah Shacknai** - *Medicis - CEO*

Ah, I'm sorry; I didn't hear it so well. I think it's taking share from some doxycycline products, both generic and branded, and certainly from generic minocycline and certainly from our own Dynacin product.

**Unidentified Speaker**

Jonah, can you talk about your IP for Solodyn and Ziana as well as an update on any patents that you might have pending?

**Jonah Shacknai** - *Medicis - CEO*

Sure. It's a very thoughtful question and one that we're asked often. I'm hoping that in the time ahead that we're able to comment a bit more definitively on the intellectual property around Solodyn. One patent that we believe covers Solodyn has already issued. There are many more claims, perhaps in the hundreds of claims that are pending at various stages before the Patent and Trademark Office. Some of those applications have been filed a while ago; others have been filed more recently. So certainly we're waiting for action in various ways from the Patent and Trademark Office.

We believe that our claims are very strong. If granted, should provide a very, very exclusive position for Solodyn. It obviously doesn't stop a generic company from risking its future in marketing a generic copy of Solodyn. We do not have the benefit of the Waxman-Hatch pre-notification provisions with Solodyn because of the antibiotic substance, minocycline, as an older substance.

But certainly we plan to put relevant parties on notice about potential infringement, willful infringement, the vigorous approach that we would take to enforcing the patent seeking treble damages, if there are any. So I think as soon as we get final action out of the Patent and Trademark Office on various points in our application, we'll be very aggressive in communicating that.

© 2007 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

## Thomson StreetEvents℠

### MRX - Medicis at Wachovia Securities 2007 Nantucket Equity Conference

Event Date/Time: Jun. 27. 2007 / 3:30PM ET



© 2007 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

Jun. 27. 2007 / 3:30PM, MRX - Medicis at Wachovia Securities 2007 Nantucket Equity Conference

---

**Unidentified Audience Member**

(inaudible - microphone inaccessible)

---

**Joe Cooper** - *Medicis Pharmaceuticals - VP Corporate and Product Development*

Sure. Well, I'll tell you what we have. We have one issued patent. We have one filed patent that is published. And we have I guess five more, either five or six, and I'm looking at Kara because there was one continuation that have been filed relative to Solodyn. So importantly the published patent covers the unique dosing of 1 mg/kg/day which is embedded in the label and we think that's a pretty strong barrier if that patent gets issued because by definition it's in the label.

We are aware that there's a lot of noise about the potential for somebody to come into this market. None of the old antibiotics are covered by Hatch Waxman prohibition against approval which is the 30 month stay that's associated with a Paragraph IV certification. None of the old antibiotics. It's not unique to Solodyn. And so there's sort of the outstanding question, well, even if you have good patents, what does that mean in terms of protecting it if somebody doesn't have a stay at FDA. Well, it means we're going to aggressively prosecute the patents, go after preliminary injunctions to ward off any infringers.

---

**Unidentified Audience Member**

(inaudible - microphone inaccessible)

---

**Joe Cooper** - *Medicis Pharmaceuticals - VP Corporate and Product Development*

They're trying to respond to it now. I think they're worried about it. I mean I can answer this in a number of ways. I think they're cognizant of it. They're worried enough about it to be disseminating urban myth about Reloxin.

A little bit of history on the toxin market. It may not be well known but Ibsen, our partner, has been marketing their form of botulinum, called Dysport, for neurologic indications longer than Allergan has been on the market in Europe and other developed countries in the world. They have never pursued themselves an aesthetic indication. They partnered ultimately with us. Of course, earlier it was a different company that had to divest the product as a result of Allergan acquiring them. But that product has been on the market a long time and is well established for safety and efficacy. It's a great product.

So we hear some noise about various characteristics of the product that are put forth as a way of basically dismissing it or minimizing it. This is a great product, so I think they're worried. I think it's one of the reasons they got into the dermal filler market. Look, they have -- they're a great company, they've got great brand recognition with Botox. Outside of the main aesthetic area they've built quite a patent portfolio. I don't know how robust it is in terms of protection. But we're quite strong in this [core four] area, which is where the most of the Botox business comes from. So I think they should be concerned.

Having said that, we both have to grow this market. That's the win at the end of the day. Not only is Allergan running DTC advertisement traditional, they have for Botox historically, they've done it more recently for their filler. We will be introducing in the third quarter a campaign television and radio for the Restylane family of products. We estimate that there are well in excess of 20 million women in sort of the sweet spot, the demographic of age 35 to 55 with household incomes somewhere above $60,000 or $70,000 who are candidates for Restylane or a botulinum toxin. And well under 10% of those are getting that treatment today. It's remarkable the potential of this market.

And I think if you'd talk to Allergan past the competitive jousting, the only thing they would tell you for certain is that we both got to grow this market.

---

© 2007 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

## Thomson StreetEvents℠

### MRX - Medicis at Thomas Weisel 2007 Healthcare Conference

Event Date/Time: Sep. 06. 2007 / 8:35AM ET

© 2007 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

F I N A L   T R A N S C R I P T

Sep. 06. 2007 / 8:35AM, MRX - Medicis at Thomas Weisel 2007 Healthcare Conference

We're right in that range, 60 million strong. And what's more encouraging, as the acceptance of cosmetic procedures becomes more and more prevalent, you'll see the younger generation, what they call the echo boomers who are 80 million strong, now becoming more and more interested in cosmetic procedures. And that's encouraging to us again driving people into those offices.

We'll discuss in a little bit a television commercial, again, to create awareness of our products and again driving them into the specialty. In the aesthetics franchise, I mentioned it growing exponentially, probably one of the fastest growing segments.

But even if you look at that aesthetic, which is really the excitement in the market right now, even the traditional marketplaces, like acne is growing about 6% a year. That alone is about $2.5 billion market, just on the therapeutic side. And that's tremendous growth for a market that's been around for years and years and years.

And what we see is, again, that aging population not only getting the aesthetic procedures but also adult acne, especially in females, is a big category for dermatologists right now. So we're very encouraged by the market trend.

We operate really under a very simple blocking and tackling four-part strategy. The first is really through the power of that relationship with the dermatologist and plastic surgeon and a very specialized sales force we grow our existing brand. And I'm very proud in the second quarter that we announced the end of June 30th, we're up about 28% year-over-year in revenue.

And that's growth from primarily the three top brands that you see here, Restylane, which is the dermal filler, Solodyn, which is an oral minocycline hydrochloride for the treatment of moderate to severe acne, and Ziana, which is a brand new product that came on the market just two quarters young in its growth. And it's already at about a $50 million run rate for the year. So we've entered into the market with a topical combination in Ziana.

But as far as Solodyn, which is the company's flagship product and probably our largest product right now, is running in excess of a $200 million growth rate. A lot of exciting things going on with Solodyn--we surpassed in the second quarter the other branded oral antibiotic in acne. So we are the number one all antibiotic in acne right now, and we're very proud of that.

And two weeks ago, in the script data, 20% of all new scripts created in the category were Solodyn prescriptions. So we're still on a growth trajectory and a lot to come. We introduced for Solodyn what we call Smart Card. The Smart Card allows the patient really to go into a pharmacist's office and get help with some of the copay amount, which for Solodyn, which is an expensive product, costs us a lot to develop.

And it's an expensive product, but it assists and helps the patient with the copay, which was the biggest issue that we were facing with the doctors. Solodyn has one patent. It is patent protected. We have six others on file that have over 100 claims associated with that. So they're sitting in the Patent and Trademark Office. Some of them were filed in 2005. They were [signed in] agent. And we continue to work very vigorously with that agent to try to get these through as expeditiously as possible.

With Restylane, which is probably the most well known of the products, we'll talk in a little bit about the television commercial that we just launched. But this is a leading dermal filler throughout the world, and there's reasons for that. It's that consistency, the safety and efficacy of this product that's really second to none in this category.

And that's why it has 40% to 60% market share in Europe, where it's competing against about 75 different dermal filler products. So we're not afraid of competition with this product. Will we lose some share? Of course, when any new competitor comes into the market, we will lose some share. But the category, as we mentioned before is growing exponentially.

We think we're covering about 5% of our target market right now, the target market being household incomes of $75,000 and more, and primarily women between 35 and 55. So when you take that small category, we're only covering about 5% of that now. You start getting the younger people in, those echo boomers who are interested in dermal fillers now, and males, and the market will go like this.

© 2007 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

## Thomson StreetEvents℠

### MRX - Medicis at Credit Suisse Healthcare Conference

Event Date/Time: Nov. 14. 2007 / 1:00PM ET

© 2008 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

**Nov. 14. 2007 / 1:00PM, MRX - Medicis at Credit Suisse Healthcare Conference**

We hoped to get the product out sooner, we didn't. It was approved last spring. It is selling I think at a very nice pace and currently represents about 30% of our RESTYLANE franchise. We have presage that we think it will ultimately represent between 40% and 50% of the franchise, and importantly Perlane is a superb product for the volumization, for restoring volume in these facial folds and wrinkles that are both a consequence of age and ultraviolet exposure.

So, very excited to have these two powerful products, even more excited I think to have the three products that we expect, at least by the time Reloxin is introduced.

On the dermatology side of the business, we are also having a pretty good year. A little over a year ago, we gained approval for a product called SOLODYN, which is an extended release minocycline hydrochloride product that has both a unique pharmacokinetic profile and a unique dose.

In the course of our discovery research around this product, we determined through extensive dose response work that we were able to get a degree of efficacy that was comparable to high doses of minocycline with our dosage form, weak dosing the product, and giving patients typically half the exposure to the drug than has been the case practically and for many years in dermatology, including our own leading product DYNACIN.

So, we have been able to offer a side effect profile that in many ways is comparable to Placebo in a category where side effects were always one of the limitations of additional prescribing, and we've done this without impairing the efficacy of the product.

SOLODYN has been enormously successful. I think many of you are aware of both of the tremendous sales success and the extreme profitability that's associated with the product for the Company. So, it's been a wonderful offering. We have had now on file with the patent and trademark office several patent applications that contain over 120 claims on SOLODYN. These claims we think are comprehensive.

They cover a number of elements of the drug, from the dosing to the formulation to the kinetic profile. They are all available at the uspto.gov website, so we invite anyone who is curious to look at those patent applications. Encouragingly, we received just last week a notice of non-final rejection of one of our patents.

This of course, is par for the course in the patent world and better than 95% of issued patents have gone through a non-final rejection phase before they are actually issued. So, we will be responding very rapidly and I think in a very strong way to the points of objection from the patent office, and we are excited hopefully about getting patents issued rapidly that would be reflected in the office action that we saw last week.

We also have a number of other applications on file with the USPTO, and we have a number of applications that we expect to file in the months ahead. So, I think we recognize clearly that protection of SOLODYN is an imperative for our company. It is an extremely important product to us, it is extremely important to patients, and ensuring its continued success in the market is as important to us as it is anything that we do.

So, I think you can be sure that in every conceivable respect, we are attempting to protect SOLODYN. This includes patent work, it includes additional research that we are doing around the drug that may lead to other forms of the drug one day, and it's certainly involved having a very aggressive defensive strategy from a legal point of view.

We are ready for challenges that may occur. We are well prepared, I think, with some of the finest lawyers that are available in the United States. So, we are poised I think to meet any challenge that occurs in the future, hoping of course that these challenges don't occur, but always planning for the worst.

We also this year launched a product called ZIANA, which [inaudible] has been very successful and I think is really that is really only at its success level, which represents a small fraction of its potential. There we have met our objective in ZIANA. I have made no secret of the fact that I think we can be doing much better.

© 2008 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

## Thomson StreetEvents℠

### MRX - Medicis at Morgan Stanley Pharmaceutical CEOs Unplugged Conference

**Event Date/Time: Jan. 04. 2008 / 8:45AM ET**

THOMSON

www.streetevents.com          Contact Us

© 2008 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Jan. 04. 2008 / 8:45AM, MRX - Medicis at Morgan Stanley Pharmaceutical CEOs Unplugged Conference

higher, we want proprietary products, we want products that are differentiated in the marketplace that we can protect and that is really important when we are looking at research and development and that are very profitable for the bottom line and for shareholders.

So I think we still have that objective at least one a year. We have as you know and we've talked about most of today a PDUFA date that would yield an approval in 2008 as well as others that we are looking at. So for the foreseeable future we do have the ability to get an approval in each of the years but we are not out there predicting it anymore.

**Louise Chen** - *Morgan Stanley - Analyst*

Can you give us an update on SOLODYN? The scripts have continued to do well. There has also been a lot of talk about potential generic competition in '08. What are you doing to protect your franchise? Are you thinking about any follow-on products? How should we think about it?

**Mark Prygocki** - *Medicis - CFO*

Sure. SOLODYN is a very important product for the company. We've spent a lot of time and effort in planning SOLODYN from everything from its inception when we first thought about SOLODYN, how we could protect it. We have over 200 claims sitting in the patented trademark office right now, 11 patents. We have a very well thought out strategy as far as the patent protection of this product. We have one existing patents that has been issued that we believe covers SOLODYN and others that we feel will be issued that will put up a larger fence for SOLODYN.

While we are working on getting patent issuances, we're also working on development of other forms of SOLODYN. So we will continue to work in that endeavor to improve the SOLODYN franchise, to improve the breadth of the SOLODYN franchise and to improve its patent protection. So we in November received from the Patent and Trademark Office, a notice of nonfinal rejection on four of the 11 patents which for us was a very encouraging sign. It outlined where the issues were for the Patent and Trademark Office and what we had to overcome in order to get an issuance of these patents. We think those are achievable.

We've responded to that -- excuse me -- we responded to that nonfinal rejection, all four of them. We've met with the PTO already. We will continue to provide them information and try to expedite an allowance as quickly as we possibly can.

So we are confident that we will get something in '08 that will continue the follow on development programs of SOLODYN and use any other means necessary to protect this brand. So it is an important brand to us. It is something we spend a lot of time on at the headquarters office and are confident that we can protect it.

**Louise Chen** - *Morgan Stanley - Analyst*

Historically you've had some other products such as DYNACIN that faced generic competition that you were able to continue to evolve the product. I mean, how should we think about SOLODYN? In light of that, is that a similar strategy, is it something different?

**Mark Prygocki** - *Medicis - CFO*

I think SOLODYN is dramatically different from that of DYNACIN. DYNACIN was launched in the face of when there was 28 other generic competitors in the marketplace. SOLODYN has unique nonobvious benefits to it, the one milligram per kilogram or the fact that the average patient instead of receiving 200 milligrams of minocycline a day now can receive 90 milligrams once a day and still have the same efficacy with a much, much greater side effect profile than that of immediate release minocycline.

© 2008 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

## Thomson StreetEvents℠

### MRX - Medicis at Merrill Lynch 19th Global Pharmaceutical, Biotechnology & Medical Device Conference

**Event Date/Time: Feb. 07. 2008 / 8:40AM ET**

© 2008 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

**Feb. 07. 2008 / 8:40AM, MRX - Medicis at Merrill Lynch 19th Global Pharmaceutical, Biotechnology & Medical Device Conference**

So it's a very, very important part of that strategy -- all growing from the fact that we're their friends. We know their birthdays. We celebrate birthdays with them. We -- Jonah still calls the doctors on their birthdays. That's how close we are with them. And, of course, the strategic acquisitions we have -- we look for acquisitions to fill market gaps that we're not currently in today.

We have $800 million in the bank. We're going to generate in 2007 well over $150 million in cash flow from operations so we're a very, very strong income statement to which we're going to deploy mainly towards business development opportunities and that's what we look forward to doing.

As far as our product line. We'll talk briefly about the product line. I know we'll skip to - get to questions as quickly as we can, but just an introduction to our product line. Restylane is the number one dermal filler in the United States. It's used to treat facial wrinkles in folds such as the nasolabial fold, that fold between the corner of the nose and the mouth. It is an injection. It's hyaluronic acid, a natural substance in every one of our bodies. It's naturally disintegrated over time in the body.

Solodyn is the number one oral antibiotic. It's a minocycline hydrochloride for the treatment of acne in patients 12 years and older. This product continues to grow. In fact, in the fourth quarter, we averaged, during the fourth quarter, about 1,000 scripts more than we did in the third quarter. We ended the year about 14,000 scripts and with a product that's priced at about $340 to $350 per prescription, it's of significant value to the Company.

Now I know there's a lot of questions around how do we protect Solodyn. And it's of tremendous interest to us when we were developing it, when we launched it, and that's why we have filed 11 patents on Solodyn, since -- dating back as early as 19 -- I'm sorry, 2005, April of 2005 we started filing. And this product is just over a year old.

So we're very encouraged by the fact that four of them, four of those 11 patents with over 200 claims -- four of them received a notice of non-final rejection from the patent and trademark office that tells us basically "here are the issues that we have with them and let's work through them." It's a very typical process in the patent and trademark office. We're working through them with the patent and trademark office as we speak and we'll continue to do so and seek resolution on them.

While we're working through the patent and trademark office, we've also been developing other forms of Solodyn that fit within that patent portfolio. <mark>So we haven't been sitting still on the Solodyn franchise and hope - with the goal of keeping it alive as long as we possibly can.</mark>

Triaz is a topical benzoyl peroxide for the treatment of acne. It's not uncommon in acne that a doctor will prescribe, for treating acne, it's three prescriptions. One something for the morning, a topical and an oral during the day and something for at night, a retinoid typically. And that's Ziana, the next product, is really the first combination of a retinoid and an antibiotic and it's been very successful in its first year, 2007 was really it's first year. The largest product in that market was about $177 million. In annual script run rate we're at about $50 million in the first year. So we think we've taken a significant portion of that retinoid business.

Now with scripts, a lot of the questions I get are, well, the trajectory's slowing a little bit and scripts are slow. We're competing against some of the giant - all the largest companies and dermatologists -- in dermatology have retinoid products and that's what we're competing against -- their number one product. So we are projecting growth in Ziana but it will be a slower trajectory than the [chair] that we're on since it's launch. Vanos is a product I skipped -- an important product for the Company - is a Class I topical steroid for inflammation.

Just a brief summary. Annual sales growth for the last five years has been about 18%. As I mentioned, 2007 will be our largest sales year ever. So we're very pleased with what our sales force has generated on the backs of Solodyn, Ziana, Restylane, all of which continue to grow. Our cash position as of the third quarter, $766 million, but with our cash flow from operations in the fourth quarter, we are over $800 million. Total assets of $1 billion. And our guidance for 2007 which will be announced at the end of February, this month, our guidance is at 454 and $1.22 for the year.

© 2008 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

PUBLIC LAW 105–115—NOV. 21, 1997

# FOOD AND DRUG ADMINISTRATION
# MODERIZATION ACT OF 1997

PUBLIC LAW 105–115—NOV. 21, 1997          111 STAT. 2325

"(4) A drug manufactured in a pilot or other small facility may be used to demonstrate the safety and effectiveness of the drug and to obtain approval for the drug prior to manufacture of the drug in a larger facility, unless the Secretary makes a determination that a full scale production facility is necessary to ensure the safety or effectiveness of the drug.".

(b) ANIMAL DRUGS.—Section 512(c) (21 U.S.C. 360b(c)) is amended by adding at the end the following:

"(4) A drug manufactured in a pilot or other small facility may be used to demonstrate the safety and effectiveness of the drug and to obtain approval for the drug prior to manufacture of the drug in a larger facility, unless the Secretary makes a determination that a full scale production facility is necessary to ensure the safety or effectiveness of the drug.".

## SEC. 125. INSULIN AND ANTIBIOTICS.

(a) CERTIFICATION OF DRUGS CONTAINING INSULIN.—

(1) AMENDMENT.—Section 506 (21 U.S.C. 356), as in effect before the date of the enactment of this Act, is repealed.

(2) CONFORMING AMENDMENTS.—

(A) Section 301(j) (21 U.S.C. 331(j)) is amended by striking "506, 507,".

(B) Subsection (k) of section 502 (21 U.S.C. 352) is repealed.

(C) Sections 301(i)(1), 510(j)(1)(A), and 510(j)(1)(D) (21 U.S.C. 331(i)(1), 360(j)(1)(A), 360(j)(1)(D)) are each amended by striking ", 506, 507,".

(D) Section 801(d)(1) (21 U.S.C. 381(d)(1)) is amended by inserting after "503(b)" the following: "or composed wholly or partly of insulin".

(E) Section 8126(h)(2) of title 38, United States Code, is amended by inserting "or" at the end of subparagraph (B), by striking "; or" at the end of subparagraph (C) and inserting a period, and by striking subparagraph (D).

(b) CERTIFICATION OF ANTIBIOTICS.—

(1) AMENDMENT.—Section 507 (21 U.S.C. 357) is repealed.

(2) CONFORMING AMENDMENTS.—

(A) Section 201(aa) (21 U.S.C. 321(aa)) is amended by striking out "or 507", section 201(dd) (21 U.S.C. 321(dd)) is amended by striking "507,", and section 201(ff)(3)(A) (21 U.S.C. 321(ff)(3)(A)) is amended by striking ", certified as an antibiotic under section 507,".

(B) Section 301(e) (21 U.S.C. 331(e)) is amended by striking "507(d) or (g),".

(C) Section 306(d)(4)(B)(ii) (21 U.S.C. 335a(d)(4)(B)(ii)) is amended by striking "or 507".

(D) Section 502 (21 U.S.C. 352) is amended by striking subsection (l).

(E) Section 520(l) (21 U.S.C. 360j(l)) is amended by striking paragraph (4) and by striking "or Antibiotic Drugs" in the subsection heading.

(F) Section 525(a) (21 U.S.C. 360aa(a)) is amended by inserting "or" at the end of paragraph (1), by striking paragraph (2), and by redesignating paragraph (3) as paragraph (2).

111 STAT. 2326        PUBLIC LAW 105–115—NOV. 21, 1997

(G) Section 525(a) (21 U.S.C. 360aa(a)) is amended by striking ", certification of such drug for such disease or condition under section 507,".

(H) Section 526(a)(1) (21 U.S.C. 360bb) is amended by striking "the submission of an application for certification of the drug under section 507,", by inserting "or" at the end of subparagraph (A), by striking subparagraph (B), and by redesignating subparagraph (C) as subparagraph (B).

(I) Section 526(b) (21 U.S.C. 360bb(b)) is amended—

(i) in paragraph (1), by striking ", a certificate was issued for the drug under section 507,"; and

(ii) in paragraph (2) by striking ", a certificate has not been issued for the drug under section 507," and by striking ", approval of an application for certification under section 507,".

(J) Section 527(a) (21 U.S.C. 360cc(a)) is amended by inserting "or" at the end of paragraph (1), by striking paragraph (2), by redesignating paragraph (3) as paragraph (2), and by striking ", issue another certification under section 507,".

(K) Section 527(b) (21 U.S.C. 360cc(b)) is amended by striking ", if a certification is issued under section 507 for such a drug,", ", of the issuance of the certification under section 507,", ", issue another certification under section 507,", ", of such certification,", ", of the certification,", and ", issuance of other certifications,".

(L) Section 704(a)(1) (21 U.S.C. 374(a)(1)) is amended by striking ", section 507 (d) or (g),".

(M) Section 735(1) (21 U.S.C. 379g(1)(C)) is amended by inserting "or" at the end of subparagraph (B), by striking subparagraph (C), and by redesignating subparagraph (D) as subparagraph (C).

(N) Subparagraphs (A)(ii) and (B) of sections 5(b)(1) of the Orphan Drug Act (21 U.S.C. 360ee(b)(1)(A), 360ee(b)(1)(B)) are each amended by striking "or 507".

26 USC 45C.    (O) Section 45C(b)(2)(A)(ii)(II) of the Internal Revenue Code of 1986 is amended by striking "or 507".

(P) Section 156(f)(4)(B) of title 35, United States Code, is amended by striking "507," each place it occurs.

(c) EXPORTATION.—Section 802 (21 U.S.C. 382) is amended by adding at the end the following:

"(i) Insulin and antibiotic drugs may be exported without regard to the requirements in this section if the insulin and antibiotic drugs meet the requirements of section 801(e)(1).".

21 USC 355 note.    (d) TRANSITION.—

(1) IN GENERAL.—An application that was approved by the Secretary of Health and Human Services before the date of the enactment of this Act for the marketing of an antibiotic drug under section 507 of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 357), as in effect on the day before the date of the enactment of this Act, shall, on and after such date of enactment, be considered to be an application that was submitted and filed under section 505(b) of such Act (21 U.S.C. 355(b)) and approved for safety and effectiveness under section

505(c) of such Act (21 U.S.C. 355(c)), except that if such application for marketing was in the form of an abbreviated application, the application shall be considered to have been filed and approved under section 505(j) of such Act (21 U.S.C. 355(j)).

(2) EXCEPTION.—The following subsections of section 505 (21 U.S.C. 355) shall not apply to any application for marketing in which the drug that is the subject of the application contains an antibiotic drug and the antibiotic drug was the subject of any application for marketing received by the Secretary of Health and Human Services under section 507 of such Act (21 U.S.C. 357) before the date of the enactment of this Act:

(A)(i) Subsections (c)(2), (d)(6), (e)(4), (j)(2)(A)(vii), (j)(2)(A)(viii), (j)(2)(B), (j)(4)(B), and (j)(4)(D); and

(ii) The third and fourth sentences of subsection (b)(1) (regarding the filing and publication of patent information); and

(B) Subsections (b)(2)(A), (b)(2)(B), (b)(3), and (c)(3) if the investigations relied upon by the applicant for approval of the application were not conducted by or for the applicant and for which the applicant has not obtained a right of reference or use from the person by or for whom the investigations were conducted.

(3) PUBLICATION.—For purposes of this section, the Secretary is authorized to make available to the public the established name of each antibiotic drug that was the subject of any application for marketing received by the Secretary for Health and Human Services under section 507 of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 357) before the date of enactment of this Act.

(e) DEFINITION.—Section 201 (21 U.S.C. 321), as amended by section 121(a)(1), is further amended by adding at the end the following:

"(jj) The term 'antibiotic drug' means any drug (except drugs for use in animals other than humans) composed wholly or partly of any kind of penicillin, streptomycin, chlortetracycline, chloramphenicol, bacitracin, or any other drug intended for human use containing any quantity of any chemical substance which is produced by a micro-organism and which has the capacity to inhibit or destroy micro-organisms in dilute solution (including a chemically synthesized equivalent of any such substance) or any derivative thereof.".

## SEC. 126. ELIMINATION OF CERTAIN LABELING REQUIREMENTS.

(a) PRESCRIPTION DRUGS.—Section 503(b)(4) (21 U.S.C. 353(b)(4)) is amended to read as follows:

"(4)(A) A drug that is subject to paragraph (1) shall be deemed to be misbranded if at any time prior to dispensing the label of the drug fails to bear, at a minimum, the symbol 'Rx only'.

"(B) A drug to which paragraph (1) does not apply shall be deemed to be misbranded if at any time prior to dispensing the label of the drug bears the symbol described in subparagraph (A).".

(b) MISBRANDED DRUG.—Section 502(d) (21 U.S.C. 352(d)) is repealed.

(c) CONFORMING AMENDMENTS.—

(1) Section 503(b)(1) (21 U.S.C. 353(b)(1)) is amended—
(A) by striking subparagraph (A); and